IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

VICTOR WAYNE HOOKS )
)
     Petitioner, )
)
vs. ) Case No. CIV-96-732-M
)
RANDALL G. WORKMAN, Warden, )
    Oklahoma State Penitentiary, )
)
    Respondent. )

## MEMORANDUM OPINION

    Petitioner, a state prisoner currently facing execution of a sentence of death, appears

with counsel and petitions for a Writ of Habeas Corpus pursuant to 28 U.S.C.A. § 2254,

challenging his sentence of death and his post-conviction mental retardation trial.

Respondent has responded to Petitioner's *Amended Second Petition for a Writ of Habeas*

*Corpus* (hereinafter "Petition.")[1]  Petitioner has replied to this response.  The state court

record of the post-conviction mental retardation trial has been supplied.[2]

## I.  PROCEDURAL HISTORY

    This is Petitioner's Amended Second Petition for Writ of Habeas Corpus.  During his

---

[1] References to the parties' pleadings shall be as follows:  Petitioner's *Amended Second Petition for a Writ of Habeas Corpus* shall be cited as (Pet. at __.); Respondent's *Response to Amended Second Petition for Writ of Habeas Corpus* shall be cited as (Resp. at __.); Petitioner's *Reply* shall be cited as (Reply at __.);

[2] The trial court's original record regarding the mental retardation trial shall be cited herein as (O.R. at __.).  The transcript of the mental retardation proceedings shall be cited as (Tr., Vol. ___, p. __.).

pending appeal with the Tenth Circuit Court of Appeals from the denial of habeas relief on his first Petition for Writ of Habeas Corpus, the United States Supreme Court issued its decision in Atkins v. Virginia, 536 U.S. 304 (2002), determining the execution of mentally retarded persons constitutes cruel and unusual punishment in violation of the Eighth Amendment. That same year, after Atkins, the Oklahoma Indigent Defense System filed in the Oklahoma Court of Criminal Appeals ("OCCA") a second application for post-conviction relief alleging that Petitioner's execution would violate Atkins. The Tenth Circuit stayed Petitioner's appeal and placed it in abeyance to allow him to litigate his mental retardation claim in state court.

The OCCA remanded Petitioner's case to the Oklahoma County District Court for a jury trial on his mental retardation issue. The jury trial was conducted June 7-15, 2004, and the jury concluded that Petitioner was not mentally retarded. Petitioner and the State filed supplemental briefs with the OCCA. On December 7, 2005, the OCCA issued its opinion upholding the jury determination and denying relief. Hooks v. State, 126 P.3d 636 (Okla. Crim. App. 2005). Soon thereafter, the Tenth Circuit entered an order extending the abeyance to allow Petitioner's counsel to prepare and file a second or successive petition with this Court.

On March 31, 2006, Petitioner filed his third application for post-conviction relief raising a claim of ineffective assistance of counsel regarding his mental retardation trial and a claim alleging the prosecutor failed to provide exculpatory evidence. The OCCA entered its order denying relief in an unpublished opinion.

## II. FACTUAL BACKGROUND

Under 28 U.S.C. § 2254(e), when a federal district court addresses "an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). For the purposes of consideration of the present Amended Second Petition, the Court provides and relies upon various factual synopses throughout this Memorandum Opinion from the OCCA's opinion summarizing the evidence presented at Petitioner's mental retardation trial. Following review of the record, trial transcripts, and the admitted exhibits, the Court finds these summaries by the OCCA to be adequate and accurate, and therefore, adopts the factual summaries as its own unless otherwise stated.

## III. PETITIONER'S CLAIMS FOR RELIEF

### A. GENERAL CONSIDERATIONS:  Exhaustion and the Procedural Bar

Federal habeas corpus relief is not available to a state prisoner unless all state court remedies have been exhausted prior to the filing of the petition. 28 U.S.C. § 2254(b); Harris v. Champion, 15 F.3d 1538, 1554 (10th Cir. 1994); see also Wainwright v. Sykes, 433 U.S. 72, 80-81 (1977). In every habeas case, the court must first consider exhaustion. Harris, 15 F.3d at 1554. "States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991). Generally, a habeas petition containing both exhausted and unexhausted claims is deemed a mixed petition requiring dismissal. Where it is clear, however, that a procedural bar would be applied by the state courts if the claim were now presented, the reviewing

habeas court can examine the claim under a procedural bar analysis instead of requiring exhaustion.  <u>Coleman</u>, 501 U.S. at 735 n.1 (citations omitted).

Habeas relief may also be denied if a state disposed of an issue on an adequate and independent state procedural ground.  <u>Coleman</u> at 750; <u>see also</u> <u>Romero v. Tansy</u>, 46 F.3d 1024, 1028 (10th Cir. 1995); <u>Brecheen v. Reynolds</u>, 41 F.3d 1343, 1353 (10th Cir. 1994).  A state court's finding of procedural default is deemed "'independent if it is separate and distinct from federal law.'"  <u>Id.</u> (quoting <u>Andrews v. Deland</u>, 943 F.2d 1162, 1188 n.40 (10th Cir. 1991)); <u>Ake v. Oklahoma</u>, 470 U.S. 68, 75 (1985); <u>see also</u>.  A state court's application of a procedural bar will be excused where a petitioner can show either:  1) cause for the default and resulting prejudice; or 2) that a fundamental miscarriage of justice would occur if the claims were not addressed in the federal habeas proceeding.  <u>Coleman</u> at 749-50.

## B.  THE STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), in order to obtain federal habeas relief once a state court has adjudicated a particular claim on the merits, Petitioner must demonstrate that the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1-2).

The Supreme Court defined "contrary to" as a state court decision that is

"substantially different from the relevant precedent of this Court." <u>Williams v. Taylor</u>, 529

U.S. 362, 405 (2000) (O'Connor, J., concurring and delivering the opinion of the Court). A

decision can be "contrary to" Supreme Court precedent "if the state court applies a rule that

contradicts the governing law set forth in [Supreme Court] cases" or "if the state court

confronts a set of facts that are materially indistinguishable from a decision of this Court and

nevertheless arrives at a result different from [Supreme Court] precedent." <u>Id.</u> at 406. The

"unreasonable application" prong comes into play when "the state court identifies the correct

governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of

the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme

Court] precedent to a new context where it should not apply or unreasonably refuses to

extend that principle to a new context where it should apply." <u>Id.</u> at 407.

### C.  GROUNDS FOR RELIEF

<u>Ground 1:</u>    <u>Constitutionality of Death Sentence</u>.

In his first ground for relief, Petitioner claims he suffers from mental retardation and

that his sentence of death is unconstitutional pursuant to <u>Atkins v. Virginia</u>, 536 U.S. 304

(2002). He specifically contends that he met the three definitional requirements of mental

retardation, that the jury's finding was contrary to the evidence presented at trial, that the

OCCA's determination was contrary to, or an unreasonable application of, clearly established

federal law, and that the state court's determination was an unreasonable determination of

the facts in light of the evidence presented at his mental retardation trial.

In <u>Atkins</u>, the Supreme Court imposed a prohibition against the execution of mentally

retarded individuals, finding that in "[c]onstruing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." Id. at 321 (citations omitted). Although the Supreme Court referenced clinical definitions of mental retardation set forth by the American Association on Mental Retardation and the American Psychiatric Association, Id. at 309 n.3, it did not enunciate or adopt a definite definition for mental retardation. Rather, it left to the states "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." Id. at 317 (citations omitted).

Subsequent to the Supreme Court's decision in Atkins, the OCCA promulgated a definition of mental retardation based on the clinical definition adopted by the American Association on Mental Retardation (AAMA)[3]:

> A person is "mentally retarded": (1) If he or she functions at a significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; (2) The mental retardation manifested itself before the age of eighteen (18); and (3) The mental retardation is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work.

---

[3] There is nothing to suggest, as stated by Petitioner, that the OCCA "reluctantly" accepted the task of establishing these guidelines. (Pet. at 19.) Such characterizations and assertions throughout Petitioner's pleadings do nothing to support or advance Petitioner's arguments or claims.

Murphy v. State, 54 P.3d 556, 567-68 (Okla. Crim. App. 2002)(footnote omitted), overruled in part in Blonner v. State, 127 P.3d 1135, 1139 (Okla. Crim. App. 2006).[4] The state court held that it is the defendant's burden to prove he or she is mentally retarded by a preponderance of the evidence. Id. at 568. It further held that "no person shall be eligible to be considered mentally retarded unless he or she has an intelligence quotient of seventy or below, as reflected by at least one scientifically recognized, scientifically approved, and contemporary intelligent quotient test." Id. (footnote omitted.) The OCCA subsequently held that a defendant is entitled to present his case to a jury and have it determine whether he is mentally retarded. Lambert v. State, 71 P.3d 30, 31-32 (Okla. Crim. App. 2003)(setting forth procedures to be used in post-conviction determination of mental retardation on remand).

In Petitioner's trial, the jury was given the following instruction for determining whether Petitioner met the legal definition of mental retardation:

### INSTRUCTION NUMBER 17

You are advised that a person is "mentally retarded" if he or she functions at a significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reaction of others. Intelligence quotients are one of the many factors that may be considered, but are not alone determinative.

In reaching your decision, you must determine:

1.     Is the Defendant a person who is mentally retarded as defined in

---

[4] The only significant difference between Oklahoma's definition and the AAMA definition is that the AAMA includes a tenth possible deficit in the area of leisure.

this instruction?

2. Was the mental retardation present and known before the Defendant was eighteen (18) years of age?

3. Does the Defendant have significant limitations in adaptive functions in at least two of the following skill areas: communication; self care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work?

If you find by a preponderance of the evidence that the answer to **each** of these questions is yes, then you must so indicate on your verdict form. If you find the answer to **any** of the above questions is no, you must so indicate on your verdict form.

Preponderance of the evidence means more probable than not.

(O.R. at 180-81.)

If Petitioner's first ground for relief is a claim that Oklahoma's definition of mental retardation or the procedures employed to determine if Petitioner is mentally retarded were contrary to, or an unreasonable application of, the Supreme Court's decision in Atkins, then Petitioner's claim must fail. Oklahoma's definition closely parallels the Supreme Court's reference to recognized associations' definitions of mental retardation. The procedures set forth in Murphy and Lambert, and utilized in Petitioner's trial, were narrowly tailored in response to the Supreme Court's determination to leave to the states the task of developing appropriate ways to enforce the constitutional restriction announced in Atkins. Petitioner has not demonstrated Oklahoma's definition or overall procedure for mental retardation trials in capital cases to be either contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

The Court, however, does not read Petitioner's first ground for relief only as an

overall challenge to either Oklahoma's definition of mental retardation or to the procedures employed to protect <u>Atkins</u>' constitutional restriction.  Instead, the Court views Petitioner's claim as one of sufficiency of the evidence - that is, that Petitioner presented sufficient evidence to prove by a preponderance of the evidence the three definitional prongs of mental retardation, and that both the jury and the OCCA unreasonably determined the facts in light of the evidence presented at trial.  This claim was considered and rejected by the OCCA in it's Opinions denying Petitioner's second and third applications for post-conviction relief. The Court will consider Petitioner's claim by individually addressing each portion of Oklahoma's definition of mental retardation.

1. Sub-average Intellectual Ability.

The first prong of Oklahoma's definitional requirements of mental retardation is whether the defendant functions at a significantly sub-average intellectual level.  Petitioner claims he meets this requirement through his sub-standard intelligence quotient (IQ) scores and through additional evidence presented of his sub-standard intellectual functioning. Petitioner's claim was considered and denied by the OCCA in his second application for post-conviction relief:

> In addition to being a threshold requirement, evidence of IQ testing may be admitted to the jury to prove whether a defendant functions at a significantly sub-average intellectual level.  Hooks presented evidence of IQ test results from first grade through the months immediately preceding the mental retardation proceeding.  Those test scores ranged from 80 to 53.  The

first test, given when Hooks was in the first grade, had a full scale IQ of 80.[5] Hooks was next tested in fifth grade and received a score of 70. The psychometrist's notes state that Hooks's attention and effort varied during the test, and he was generally indifferent during its administration. She did recommend him for educable mentally handicapped (special education) classes.

In 1978, when he was sixteen, Hooks was injured when a tractor-trailer struck his car, and his father died in an unrelated accident six months later. Hooks's mother applied for Social Security disability on his behalf as a result of the accident, and also sued the trucking company, claiming Hooks's mental ability had been damaged in the accident. In 1978, after the accident, Dr. Tuoti tested Hooks with an IQ of 61, but suggested that Hooks did not cooperate during testing and his intellectual level might have been higher. In 1979, Dr. Phillips tested Hooks in connection with the lawsuit and obtained an IQ of 57; he noted that Hooks was moderately cooperative but gave up quickly on difficult tasks. Dr. John Call examined Hooks in 1980, in connection with the Social Security Claim. He determined that Hooks was mentally retarded and had catatonic schizophrenia, but did not produce an IQ score because he was unable to independently test Hooks.[6] During the mental retardation proceedings, both Hooks's and the State's expert witnesses agreed that these examinations might not reflect Hooks's true intellectual ability, either because he did not cooperate with testing or due to the trauma of the accident and the loss of his father. Testimony also showed that in 1988, Dr. Phillip Murphy tested Hooks with an IQ of 80.

Hooks has had three IQ tests since his trial and direct appeal in this capital case. In 1994, Hooks was evaluated by Dr. Gelbort who gave Hooks a neuropsychological evaluation which included an IQ score of 72. Dr. Gelbort was not specifically asked to examine Hooks for mental retardation and did not administer any adaptive functioning tests. While Dr. Gelbort did not, at that time, diagnose Hooks as mentally retarded, during testimony at the mental retardation proceeding he stated that, taking into account his testing and

---

[5] Information on this test was very limited and the expert witnesses all agreed it should not be accorded too much weight. (footnote 9 in original)

[6] Dr. Call relied in part on Dr. Tuoti's testing, in diagnosing mental retardation. He testified that Hooks was mute during the exam and he may have been experiencing a psychotic episode. Dr. Call did find that Hooks had adaptive functioning deficits in at least two areas. He estimated Hooks's social functioning at a 2.7 years age level. (footnote 10 in original)

subsequent tests, he would now make that diagnosis. In 2002 Dr. Cowardin gave Hooks adaptive functioning tests and an IQ test with a score of 76, and diagnosed him with mild mental retardation. Hooks cooperated with both Dr. Gelbort and Dr. Cowardin during the testing process. In 2004 Dr. Hall evaluated Hooks and obtained an IQ of 53. She noted Hooks was not cooperative. The experts agreed this score probably did not reflect Hooks's intellectual ability.

The experts agreed this range of scores put Hooks in a "gray area". The tests of 70 and below all reflected some degree of lack of cooperation on Hooks's part, from variable attention span to refusal to respond. Two of them were obtained after Hooks suffered the trauma of an accident and his father's death, which could have caused him to test lower than his actual intellectual level. The expert witnesses agreed that the most reliable scores were those obtained by Dr. Gelbort and Dr. Cowardin, with results of 72 and 76. Neither of these scores meets the "seventy or below" requirement in Murphy, [7] although Dr. Gelbort's results are within that range using the standard error of measurement (a five-point range on either side). Given the other testimony, it was not unreasonable for jurors to determine that the most reliable IQ evidence offered did not fall within the first prong of the Murphy definition, functioning at a significantly sub-average intellectual level. A rational trier of fact could have found that Hooks failed to meet this burden by a preponderance of the evidence.

Hooks, 126 P.3d at 640-41.

Soon thereafter, Petitioner filed with the OCCA his third application for post-conviction relief, raising issues of ineffective assistance of counsel stemming from the mental retardation proceedings and claims that the prosecutors failed to turn over exculpatory evidence to defense counsel. Petitioner supplemented his previous evidence with an I.Q. test performed on Petitioner in 2006 and subsequent to his second request for post-conviction relief. The latest test resulted in a score of 67. When considering this new evidence in the

---

[7] Murphy, 54 P.3d at 568. (footnote 11 in original)

context of Petitioner's ineffective assistance claim, the OCCA determined:

Hooks claims counsel was ineffective in failing to have Hook's IQ tested before the mental retardation trial. Hooks presented evidence of nine IQ tests, from first grade to the months before the mental retardation proceeding, with scores ranging from 53 to 80. In the latest test presented to the jury, conducted by Dr. Hall, a State's expert, Hooks had an unreliable result of 53. Hooks had a history of not cooperating when taking IQ tests, some tests may have been irregularly administered, and some scores may have reflected health or emotional problems Hooks may have had at the time of those tests. The experts agreed that the most reliable test was administered in 1994, with a score of 72. The experts at Hook's trial agreed that, given the 5-point standard error of measurement in the test scores, Hooks was in a gray area. While some experts noted Hook's reliable score of 72 could have been slightly inflated[8], nothing before this Court now or from the district court proceedings suggests that the score inflation would have been significantly outside the standard error of measurement. Counsel did not arrange for Hooks to be tested by a defense expert before the mental retardation proceedings. Counsel avers that this was due to a lack of time, and that a subsequent test showed a score of 67.

Counsel fails to show that Hooks was prejudiced by this omission. Counsel relies on an affidavit by Dr. Hall. Dr. Hall had testified for the State that she believed Hooks functioned in the borderline range. After reviewing the most recent IQ test, Dr. Hall avers that she would now say Hooks falls within the mild mentally retarded to borderline range, based on the evidence that the two most apparently reliable scores, of 67 and 72, are within the upper end of the mild mentally retarded range and the lower end of the borderline range. Dr. Hall stated that it is "possible" Hooks meets the requirement of significantly subaverage intellectual functioning necessary for a finding of mental retardation for capital proceedings. Assuming that Hooks would have had the same test results as he did when tested after the mental retardation proceedings, we cannot say that counsel's failure to have Hooks tested before those proceedings undermines our confidence in the outcome of the case. Jurors were presented with a wide range of IQ scores, most of which placed him somewhere in the gray area between borderline functioning and mentally

---

[8] The experts referred to the "Flynn Effect", a theory suggesting that, as IQ scores in the general population rise through time, IQ tests must be renormed over time to provide accurate assessments. (footnote 25 in original)

retarded.  Jurors also considered other evidence showing Hook's intellectual and adaptive functioning were above the deficits required for a finding of mental retardation.  The new test results and Dr. Hall's new opinion do not constitute such significant changes from the evidence presented that taken into account with the other evidence, jurors would have reached a different conclusion.  As Hooks fails to show prejudice, we will not find counsel ineffective for this lapse.

Hooks v. State, Opinion Denying Post-Conviction Relief, PCD-2006-350, pp. 8-10.

In his argument in support of this sub-claim of significant sub-average intellectual functioning, Petitioner first argues he has met the requirement of an IQ of about 70 or below. He basis this argument on the testimony of his experts at the mental retardation trial, and the newly offered IQ test score of 67.  With or without this new evidence, there does not appear to be much controversy that Petitioner is in a gray area between borderline functioning and mild mental retardation, considering the test scores and the 5 point standard of error measurement testified to by the experts and accepted by the OCCA.

Respondent agrees that the OCCA acknowledged that the scores could be within the range demonstrating mental retardation using the standard error of measurement, but adds that it would not be unreasonable, given the other testimony regarding Petitioner's functioning (operating a prostitution business, purchasing cars, operating a vehicle, leasing apartments, etc.), for the jury to determine his IQ to not fall within the Murphy range.  To counter this assertion, Petitioner offers the following examples as additional evidence of his sub-average intellectual functioning: (1) he was born premature and failed to timely reach developmental milestones of childhood; (2) school records demonstrating below average

functioning; (3) an award of social security disability benefits for mental retardation;[9] (4) inability to maintain a job, relying on money sent from his mother to pay bills; (5) reliance on other inmates in prison to meet his everyday needs (asserting he is unable to communicate with his family in written form, obtain prison canteen items on his own, or effectively communicate with prison officials without the assistance of others); (6) opinion of a prison counselor who previously worked with Petitioner likening him to a child and believing him to be mentally retarded; and, (7) supplemental opinion of Petitioner's expert Dr. Nancy Cowardin that new information from the prison counselor and affidavits of other inmates provides additional support for her earlier determination that Petitioner suffers significant deficits in the adaptive functioning areas of communication, health and safety, social skills, and functional academics.

As determined by the OCCA, the new evidence does not constitute significant changes from the evidence presented to the jury at the mental retardation trial. Dr. Cowardin's opinion was not changed. Rather, in her opinion, the new evidence "would have lent much credibility to the formal test data which I delineated at his 2004 trial." (Pet., Attachment 26.)[10] Although the OCCA determined that it was not unreasonable for the jurors to

---

[9] This award of social security benefits was subsequent to the accident in which Petitioner was involved in when he was 16 years old and after his lawsuit against the trucking company.

[10] Dr. Cowardin's report does not appear to include other information presented to the jury regarding Petitioner's ability to negotiate and purchase vehicles, various lease agreements entered into by him on apartments, allegations of him operating a prostitution business, and his ability to pawn property to obtain money to purchase food and baby items.

determine the most reliable IQ evidence did not fall within the first prong of the <u>Murphy</u>

definition - a determination itself that Petitioner has not demonstrated to be unreasonable -

it is also possible the jury did find the first prong met, but instead found that Petitioner failed

to meet one of the other definitional prongs.

2. Manifestation Before Age 18.

There appears to be no dispute regarding the second prong of the <u>Murphy</u> test that

Petitioner's condition manifested itself before he was eighteen:

> Hooks met the second <u>Murphy</u> requirement. Whether he was considered mentally retarded or "slow", everyone agreed this condition had manifested itself before he turned eighteen. In fact, Hooks had been diagnosed with mild mental retardation during a stay at Eastern State Hospital, and was placed in educable mentally handicapped classes by fifth grade. However, standing alone, this is not enough to conclude that Hooks is mentally retarded for capital sentencing purposes.

<u>Hooks</u>, 126 P.3d at 641.

3. Significant Limitations in Adaptive Functioning.

The third prong of the <u>Murphy</u> definition of mental retardation involves the

demonstration of significant limitations in adaptive functioning. The OCCA has explained

adaptive functioning, significant limitations, and set forth both the defendant's and the state's

required burden of proof in this area:

> The third prong, significant limitations in adaptive functioning, describes deficits common in mentally retarded people. These limitations may also be caused by other mental or social conditions. A defendant must show he has significant limitations in adaptive functioning, but is not required to show that mental retardation is the cause of his limitations in these skill areas. In order to counter such a claim, the State must present evidence negating those particular skill limitations. Unless a defendant's evidence of particular

15

limitations is specifically contradicted by evidence that he does not have those limitations, then the defendant's burden is met no matter what evidence the State might offer that he has no deficits in other skill areas. In fact, the State need not present any evidence that a capital defendant can function in areas other than those in which a deficit is claimed. In capital mental retardation proceedings, the State's first response must always be to counter the evidence presented by the defendant.

Lambert v. State, 126 P.3d 646, 651 (Okla. Crim. App. 2005)(footnotes omitted).

Petitioner asserts that he has demonstrated significant deficits in four areas of adaptive functioning: communication, health and safety, self-direction, and functional academics. The OCCA considered Petitioner's claim and determined that a rational trier of fact could have determined that Petitioner did not meet his burden of demonstrating the existence of these deficits:

In large part Hooks relied on the same evidence to prove both the Murphy requirements of significantly subaverage intellectual level and significant deficits in adaptive functioning. Insofar as Hooks relied on his IQ tests to show subaverage intellectual functioning, the discussion above shows those results were inconclusive. Dr. Cowardin found Hooks had significant limitations in adaptive functioning in communication, functional academics, self-direction, and health and safety. The State presented evidence specifically countering these findings. Taken as a whole, the evidence showed Hooks had some difficulties communicating but could understand others, make himself understood, express his wishes, and understand those of other people. The category of functional academics includes both school progress and the ability to use acquired knowledge in life situations. While Hooks had very poor grades and was in some special education classes, he reads at least at a fourth grade level and reads for pleasure in prison, can shop for clothing, food, and leisure goods, has pawned items for cash, bought cars, and leased apartments, drives, and can follow road signs and instructions while driving. Dr. Cowardin found Hooks has some deficiency in self-direction because, according to her information, he has a history of unproductive use of his time. Other evidence showed that, before being incarcerated, he had worked as a laborer, accepted the responsibility to provide food and diapers for his children, and employed some women as prostitutes, requiring them to give him their earnings and a

portion of their food stamps. Dr. Cowardin found deficits in health and safety because Hooks gave only one answer to each test question when two were called for. However, the answers Hooks gave were appropriate. In addition, as the trial court noted, "Hooks was meticulous in his personal grooming and housekeeping and required the women that lived in his home to conform to his standards." Although circumstantial evidence suggested Hooks may have had help writing letters from prison, he did write detailed and cogent letters to his daughter which included fatherly advice, descriptions of prison, and expressions of his feelings for her. Taken as a whole, a rational trier of fact could have determined that this evidence did not show significant deficits in adaptive functioning or a significantly subaverage intellectual level. Hooks failed to meet his burden on this issue.

Hooks, 126 P.3d at 641 (footnotes omitted).

Petitioner submits additional information in the form of a revised opinion from Dr. Cowardin after review of two inmates' affidavits who lived with Petitioner and information gathered by an investigator from a Department of Corrections counselor. He asserts Dr. Cowardin's supplemental report and the additional information lends additional support for the deficits previously found and testified to by Dr. Cowardin. Respondent contends that Petitioner has failed to demonstrate that the OCCA's determination was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented, and that Petitioner is attempting to convince this Court to ignore the jury's choice of which evidence to credit and instead credit the counter evidence to find Petitioner mentally retarded.

Petitioner replies that Respondent fails to account for Petitioner's most recent I.Q. test result of 67 and fails to account for evidence discovered after Petitioner's trial. This evidence, however, was not considered by the OCCA in reference to Petitioner's claim that

he is in fact legally mentally retarded or that the jury's verdict was incorrect or improper. Instead, the OCCA considered the new information in reference to Petitioner's ineffective assistance of counsel claim.

In addition to the facts and evidence set forth by the OCCA, additional evidence was presented that could have reasonably led a jury to believe that Petitioner did not meet all of the requirements of <u>Murphy</u>'s test for mental retardation. Eric Mullenix with the Oklahoma City Police Department testified regarding interviews with Petitioner during the investigation of the homicide. Detective Mullenix had no concerns during the course of the interview that Petitioner was mentally retarded or that he was unable to understand. (Tr., Vol. V., p. 162.) A portion of the interview was tape recorded and the transcript was read into evidence at the mental retardation trial. In the interview, Petitioner was able to give his wife's and childrens' names and birth dates. (Tr., Vol. V., pp. 165-66.) He talked in the interview about running errands, going to the store, having his muffler repaired, and giving a previous landlord the keys to an apartment so he could get his deposit returned. (Tr., Vol. V., p. 167.) He explained about stress he experienced because of bills and expenses, and how he had pawned certain items of personal property to get money for diapers and groceries for his child. (Tr., Vol. V., p. 168.) Petitioner stated in the interview that he did whatever he could, hustling on the street, and that he had tried to get a job with his common law wife's mother but that she refused him because of his race. (Tr., Vol. V., pp. 168-69.) He described driving across the state to visit his mother (Tr., Vol. V., p. 169), and claimed to have been responsible for getting his wife free of her addiction to drugs. (Tr., Vol. V., p. 173.)

Clara Hooks, Petitioner's mother, testified that he wore nice clothes, kept them and himself clean, and was a very neat person. (Tr., Vol. II., pp. 214-15.) Testimony was also presented that he occasionally drove to Idabel to visit his mother. (Tr., Vol. III., p. 218.)

In summary, the OCCA held:

> Hooks's slow intelligence manifested itself before age eighteen. His IQ tests certainly suggest he has borderline intelligence but do not clearly meet the Murphy definition for mental retardation. In any case, all the definitional requirements must be met, and evidence countered Hooks's claims of significant adaptive functioning deficits. Taken in the light most favorable to the prevailing party, a rational trier of fact could have found that Hooks provided insufficient evidence to show he was mentally retarded. Proposition I is denied.

Hooks, 126 P.2d at 641.

Petitioner presents this claim asserting that he has met the three definitional requirements of mental retardation, yet is still currently sentenced to death in violation of Atkins. Although Petitioner sets forth the evidence presented at trial and subsequent evidence presented and considered by the OCCA to support his claim, he never contends his claim is one of sufficiency of the evidence, nor does he set forth the relevant standard to demonstrate he sufficiently met these requirements. Normally, when reviewing whether the evidence supports a jury's verdict and a state court's determination, the proper standard for review is the one pronounced by the Supreme Court in Jackson v. Virginia, 443 U.S. 307 (1979). In Jackson, the Court set forth the familiar standard for review of habeas claims of insufficient evidence. The relevant question on habeas review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt." Id. at 319. In the instant case, the OCCA determined that a rational trier of fact could have found that Petitioner failed to meet his burden of proof by a preponderance of the evidence. Hooks, 126 P.3d at 641. Petitioner has not demonstrated the OCCA's determination to be contrary to, or an unreasonable of, clearly established law as determined by the Supreme Court. The state court followed the Supreme Court's pronouncement in Atkins and established a procedure and definition consistent with that pronouncement. It also reviewed Petitioner's claims in a manner not inconsistent with Jackson.[11] Further, Petitioner has not demonstrated that the state court's determination was an unreasonable one in light of the evidence presented. Accordingly, Petitioner's first ground for relief is denied.

Ground 2:    Adequacy of State's Procedure for Mental Retardation Trial.

In his second ground for relief, Petitioner asserts a myriad of claims under an overall contention that the procedures employed by the state of Oklahoma to litigate his mental retardation claim were "woefully inadequate" (Pet. at 35) to protect his constitutional rights and are not entitled to deference by this Court. More specifically, Petitioner asserts: (1) that he presented sufficient evidence to demonstrate his mental retardation, and that the OCCA applied an unconstitutional standard of review; (2) that a potential juror was improperly removed for cause; (3) erroneous trial court rulings; (4) failure of the prosecution to reveal exculpatory information; (5) ineffective assistance of counsel; and (6) ineffective assistance

---

[11] This claim will be further discussed below in Petitioner's second ground for relief.

of appellate counsel. Respondent responds generally that Petitioner is not entitled to relief as the OCCA's resolution of these claims was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented.

### 1. Sufficiency of the Evidence.

Similar to his claim in ground one, Petitioner contends that he presented sufficient evidence in state court to demonstrate his mental retardation, but that the OCCA applied an incorrect standard of review to his claim. Petitioner claims the OCCA applied the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979), reviewing the evidence in the light most favorable to the state. In Jackson, the Supreme Court set forth the standard for inquiry on review of a claim regarding sufficiency of the evidence to support a criminal conviction: "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis original)(citing Johnson v. Louisiana, 406 U.S. 356, 362 (1972)). The Supreme Court stated that this standard gives full play to the jury's responsibility to resolve conflicts in the testimony, weigh the evidence, and to draw reasonable inferences from the facts. Id.

After summarizing its review of the evidence presented at Petitioner's mental retardation trial, the OCCA held, in part: "Taken in the light most favorable to the prevailing party, a rational trier of fact could have found that Hooks provided insufficient evidence to show he was mentally retarded. Proposition I is denied." Hooks, 126 P.2d at 641. Petitioner

claims this standard is inappropriate, as the burden is placed on him to prove his mental retardation, and the Jackson standard is only applicable in habeas review when the burden is on the state. Petitioner claims the proper standard of review is one in which the court reviews the evidence in the light most favorable to the party with the burden of proof. Petitioner fails to provide any authority for his asserted standard. Conversely, however, Respondent cites to Maynard v. Boone, 468 F.3d 665 (10th Cir. 2006), a case regarding a challenge to the sufficiency of the evidence in a competency hearing, for the proposition that, as in Maynard, the Jackson standard is the proper standard of review, despite the burden of proof. Id. at 674 n. 6. In Maynard, the Tenth Circuit stated that "[u]nder AEDPA, a challenge to the sufficiency of the evidence must establish that no 'rational trier of fact' could have found Maynard competent by a preponderance of the evidence." Id. at 674.

The traditional standards for reviewing a sufficiency of the evidence claim do not precisely fit the situation here, where the Petitioner instead of the state has the burden to prove by a preponderance of the evidence that he is mentally retarded. The OCCA's application of this standard to the evidence presented at trial resulted in its determination that a rational trier of fact could have found that Petitioner provided insufficient evidence to show that he was mentally retarded. Although viewed in the light most favorable to the state, this standard incorporates the burden of proof placed on Petitioner and, as in Jackson, respects the responsibilities and province of the jury. Similar results were reached in Maynard regarding competency and in other jurisdictions on habeas review of sufficiency of the evidence claims regarding an insanity defense. See Perez v. Cain, 529 F.3d 588, 594 (5th

Cir. 2008)(Louisiana law regarding legal insanity defense makes sanity a rebuttable presumption by defendant to prove by preponderance of evidence and question on review framed under the <u>Jackson</u> sufficiency standard). Petitioner has not demonstrated that the OCCA's use of this standard to review his sufficiency of the evidence claim was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or that the OCCA's factual determinations were unreasonable in light of the evidence presented at Petitioner's trial.

Petitioner next asserts the OCCA's treatment of jury verdicts in <u>Atkins</u> cases was inconsistent and unequal in violation of his Eighth and Fourteenth Amendment rights. He claims that the OCCA was inconsistent in the approach it applied in his case when compared with other state cases in which it overturned jury determinations that no mental retardation had been proven. Respondent responds only that this issue is unexhausted in state court and is procedurally barred from habeas review. Petitioner replies that Respondent is incorrect, as he argued multiple times in his Third Application for Post Conviction Relief that the OCCA's decision in his case was inconsistent with its actions and decisions in other capital mental retardation cases. (Reply at 12-13.) A determination of whether this issue is unexhausted is unnecessary, however, as the Court may more easily consider the claim and deny it on the merits. 28 U.S.C. § 2254(b)(2).

In the first case cited by Petitioner, <u>Pickens v. State</u>, 126 P.3d 612 (Okla. Crim. App. 2005), the OCCA utilized the <u>Jackson</u> standard, reviewing the evidence "in the light most favorable to the State to determine if any rational trier of fact could have reached the same

conclusion". Id. at 614. In its review under that standard, the OCCA found that the defendant had proven all three prongs of the Murphy standard, overruled the jury's determination, and imposed a sentence of life without the possibility of parole. The evidence presented in Pickens, however, differs from the evidence presented to the jury in Petitioner's case in the area of significant limitations in adaptive functioning. In Pickens, evidence was presented of significant deficits in the area of self care (difficulties in dressing himself, poor physical appearance, and poor and improper grooming habits) and social judgment and planning ability (lack of socialization as child, lack of knowledge of basic physiology, inability to size up social situations, and evidence of a specific instance of self-inflicted burns from throwing gas on a fire after being warned against it). Id. at 615.

The OCCA also imposed the same standard of review in Lambert v. State, 126 P.3d 646, 649 (Okla. Crim. App. 2005), stating:

> This Court reviews the jury's factual determination in the light most favorable to the State, to determine whether any rational trier of fact could have found that the defendant failed to meet his burden of proving mental retardation by a preponderance of the evidence.

Id. at 649 (citing Myers v. State, 130 P.3d 262, 267 (Okla. Crim. App. 2005)). As in Pickens, the OCCA found that the defendant had provided proof of significant limitations in adaptive functioning. The OCCA listed several facts proven at trial, including that he was often unclean, hungry and inappropriately dressed. He had laid in the street in traffic, ran under a moving train, cut and burned himself, and swallowed wire. He had poor printing, very poor spelling and lack of organized thought. He also had few friends, preferred the company of

younger children, and was easily manipulated. All of these factors were agreed to by the State at trial, but alternative explanations were offered. The OCCA held that by accepting Lambert's assertions in these areas, the State had failed to contradict his claims. Id. at 652-53. Finding that Lambert had proven all three of the Murphy prongs by a preponderance of the evidence, Id. at 653, the OCCA modified his death sentences to two sentences of life without the possibility of parole. Id. at 659.

Petitioner's other cited case, Salazar v. State, 126 P.3d 625 (Okla. Crim. App. 2005), differs in the predominant claims made and its analysis of the issues. Although the jury's determination that mental retardation was not demonstrated was overturned by the OCCA, Salazar was determined on the issue of ineffective assistance of counsel, and not a review of the sufficiency of evidence presented to the jury in support of the Murphy standard for mental retardation.

The OCCA's determination in these cases and in Petitioner's case was based on individual review and consideration of the evidence presented in each case. Although the OCCA's determinations in the cases offered by Petitioner overturned the jury's verdict and granted relief in the form of vacating the sentences of death, it has also applied the same standard of review and consideration and upheld jury verdicts on the failure to prove mental retardation in several cases. See Myers v. State, 130 P.3d 262 (Okla. Crim. App. 2005); Ochoa v. State, 136 P.3d 661 (Okla. Crim. App. 2005); Howell v. State, 138 P.3d 549 (Okla. Crim. App. 2005). Petitioner has failed to demonstrate the OCCA's determination in his case was inconsistent with and unequal to it's determination in other similar cases sufficient to

rise to a violation of his Eighth and Fourteenth Amendment rights.

Petitioner lastly claims that regardless of the standard applied, he presented sufficient evidence to establish he was mentally retarded, and that the jury's determination does not comport with the evidence presented at trial. As discussed in consideration of Petitioner's first ground for relief, supra, the OCCA carefully and thoroughly considered the evidence presented, along with new evidence proffered by Petitioner, and determined that a rational trier of fact could have found that Petitioner presented insufficient evidence to show that he was mentally retarded. Petitioner has not demonstrated the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or an unreasonable determination of the facts in light of the evidence presented.

## 2. Removal of Potential Juror for Cause.

Petitioner next claims the trial court erred in sustaining the state's request to remove potential juror Donna Paddock for cause, and that the OCCA's determination of this claim was contrary to, or an unreasonable application of, clearly established federal law. Petitioner claims that the jury, or at least Ms. Paddock, should have been instructed on the legal definition of mental retardation during voir dire to determine if she or other potential jurors could follow that definition, and that failure by the trial court to do so denied him a fair trial in violation of Atkins.

During voir dire, it was determined that Ms. Paddock had both a bachelor's degree and a master's degree in counseling. (Tr., Vol. I, p. 105.) As a counselor, she had seen

mentally retarded clients. (Tr., Vol. I, p. 124.) When later asked if there was a conflict between what she had learned in her profession and what the law defined as mental retardation, she did not believe she would be able to set aside what she knew. (Tr., Vol. I, p. 159.) At a side bar and out of the hearing of the prospective jurors, the prosecutor moved - over objection from Petitioner's counsel - to strike Ms. Paddock for cause on the ground that she would not be able to follow the law. (Tr., Vol. I, p. 160.) The trial court questioned Ms. Paddock at the bench, out of the hearing of the prospective jurors:

> THE COURT: Ms. Paddock, at the conclusion of this trial I'm going to present the entire jury with a set of instructions.
> PROSPECTIVE JUROR PADDOCK: Uh-huh.
> THE COURT: The jury instructions are all of the law under the law - -
> PROSPECTIVE JUROR PADDOCK: Right.
> THE COURT: - - that you are to weigh the evidence.
> PROSPECTIVE JUROR PADDOCK: Right.
> THE COURT: And to determine whether the defendant has met his burden of proof through his attorneys.
> Now I understand that you have a background, that you have indicated to us. And I don't know what your definition is of mental retardation, but under the law - -
> PROSPECTIVE JUROR PADDOCK: Uh-huh.
> THE COURT: - - there is a specific definition and you are to decide by a preponderance of the evidence whether the defendant has proved under the law that definition that I'll provide you in the jury instructions.
> PROSPECTIVE JUROR PADDOCK: Uh-huh.
> THE COURT: Can you follow that definition?
> PROSPECTIVE JUROR PADDOCK: It's going to depend on how close it is to the definition I know clinically. Because I don't know the definition by the law.
> THE COURT: Okay.
> PROSPECTIVE JUROR PADDOCK: And so if they're not the same, I would tend to lean toward what I've been taught clinically, because that's what's - - that's what I practice. That's what I do. That's what's inbred, so to speak. And so if there was a difference, I would have a major conflict, because I would lean toward the clinical definition versus the legal because

that's where I come from.

   THE COURT: Okay. And do you understand there may be a clinical definition and there may be a legal definition and they may or may not conflict?

   PROSPECTIVE JUROR PADDOCK: That is right.

   THE COURT: But your duty, as a juror - -

   PROSPECTIVE JUROR PADDOCK: Yes.

   THE COURT: - - would be to follow the legal definition in this case. If I give you that definition in the jury instructions, can you follow that definition?

   PROSPECTIVE JUROR PADDOCK: If they're not the same, no.

   THE COURT: Okay.

(Tr., Vol. I, pp. 161-63.)  Defense counsel continued to object to excusing Ms. Paddock for cause, and requested that the jury, or at least Ms. Paddock, be told the legal definition of mental retardation.  Counsel argued that because she had been given the impression that the definitions differed, it was unfair to Petitioner to excuse her when, if she was informed, she might answer that she could follow the instructions.  The trial court determined there was no precedent for instructing the prospective jurors in order to determine if they would follow the law, and that Ms. Paddock did not respond to the court that she would unequivocally follow the law as set forth in the instructions.  Following argument from counsel, the trial court excused Ms. Paddock for cause. (Tr., Vol. I, pp. 165-67.)

The OCCA cited to the standard set forth in  Wainwright v. Witt, 469 U.S. 412 (1985), and denied Petitioner's claim:

   In Proposition VII Hooks complains that the trial court erred in removing a potential juror for cause.  The Murphy definition of mental retardation for capital punishment purposes is substantially similar to the accepted clinical definitions of mental retardation.  However, it differs slightly in requiring proof of significant limitations in adaptive functioning in nine, rather than ten, areas (omitting the category of "leisure").  Juror Paddock had

professional experience with mental retardation. She was asked whether, if the state and clinical definitions differed, she could follow the laws and apply the definition given by the trial court. She replied that she could not if the differences were significant, and was excused for cause over Hooks's objection. The decision to excuse a juror for cause is within the trial court's discretion. A juror must agree to follow the law; any other response would prevent or substantially impair performance of her duties in accordance with her instructions and oath. While in fact the differences between the state and clinical definition are so small there is little likelihood of conflict, that is not the issue. In order to be qualified as a juror, Juror Paddock had to agree to follow the law, whatever it was. She could not do this. The trial court did not abuse its discretion in excusing her for cause. Proposition VII is denied.

Hooks, 126 P.3d at 645 (footnotes omitted).

In Wainwright, the Supreme Court set forth the standard for determining whether a juror may be excluded for cause because of his or her views on capital punishment. The proper standard is whether those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright, 469 U.S. 412, 424 (1985). On habeas review, this Court is required to accord findings of the state courts on factual issues a presumption of correctness. Id. at 426; 28 U.S.C. § 2254(d); see also Patton v. Yount, 467 U.S. 1025, 1038 (1984). A juror's bias does not need to be proven with unmistakable clarity, Wainwright, 469 U.S. at 424, and in situations where the record lacks clarity, "deference must be paid to the trial judge who sees and hears the jurors". Id. at 426.

Although the issue involved in Petitioner's trial pertained to mental retardation, and not a juror's views on the death penalty, the standards and rationales set forth by the Supreme Court in the above cases are equally applicable. The trial court carefully and thoroughly

questioned Ms. Patton to determine whether she could follow the law as would be set forth in the instructions and determined that she had stated she could not. (Tr., Vol. I, p. 165.) Petitioner has offered no authority for his contention that Ms. Patton should have been instructed on the law at that time, or that the trial court should have determined her understanding of the clinical definition of mental retardation and compared it to its legal definition. Petitioner has failed to demonstrate by clear and convincing evidence that the trial court's factual finding was incorrect, and has failed to demonstrate that the OCCA's determination was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

### 3. Trial Court Rulings.

Petitioner next claims the trial court made several erroneous rulings which contributed to a finding that he was not mentally retarded. Petitioner claims these rulings denied him a fair trial on the issue of mental retardation in violation of <u>Atkins</u>, and that the trial court's failure to follow Oklahoma law is a violation of his Fourteenth Amendment Due Process rights under <u>Hicks v. Oklahoma</u>, 447 U.S. 343 (1980). Respondent responds that Petitioner's claims must be denied because the OCCA's affirmations of the trial court's rulings are neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.

#### a. Failure to allow impeachment and cross-examination of State's Witness.

Petitioner first claims that when the trial court sustained the state's objections to attempts to impeach Shanna Dinh's testimony on cross-examination, it denied him a fair trial

and due process of law in violation of <u>Atkins</u>.  Petitioner presented this claim to the OCCA,

which it addressed on the merits and denied relief:

> Hooks claims in Proposition IV that the trial court erred in limiting his cross-examination of State's witness Dinh.  Admission of evidence is within the trial court's discretion, and will be disturbed only on a showing of prejudice.  The extent of cross-examination is within the discretion of the trial court.  Cross-examination may be limited to the subject matter of the direct examination and encompass questions of witness accuracy, memory, veracity, or credibility.  Ms. Dinh had lived with Hooks and worked for him as a prostitute when she was a teenager, beginning at age thirteen.  She testified about her observations of Hooks during the time she knew him, including his ability to lease apartments, buy cars, and oversee the actions of several women and girls.  When defense counsel attempted to cross-examine Dinh by asking where her parents were when she met Hooks, the State objected and the trial court ruled that her parents' location had no bearing on Dinh's credibility. Hooks has not shown otherwise, and this ruling was not an abuse of discretion.

> Dinh testified that she lived with Hooks for most of her teenage years, spending a few months in foster care when she had a baby.  Hooks wanted to cross-examine on this issue to show that Dinh had previously stated she lived with Hooks for only a few months, and that she was in foster care for several years.  The trial court allowed counsel to ask Dinh how long she had been in foster care but refused to allow counsel to impeach Dinh with unsworn hearsay statements.  The trial court noted that, however long Dinh had actually lived with Hooks, her testimony had been limited to her observations of his mental abilities and there was no dispute that she did have the opportunity to observe Hooks for some time.  This decision was not error.  Hooks also wanted to impeach Dinh with statements contradicting her prior testimony regarding other women Hooks knew at the time.  While counsel was allowed to question Dinh about her previous statements, the trial court refused to allow counsel to impeach Dinh with prior testimony which involved people and issues other than Hooks and factors bearing on mental retardation.  The court found that any discrepancies in the prior testimony might bear on Dinh's credibility, but the entire line of questioning was wholly irrelevant to the issue of mental retardation.  This decision was not an abuse of discretion.  Dinh's evidence that Hooks ran a prostitution ring was limited to the ways in which this demonstrated his mental abilities, and the trial court limited cross-examination to that issue as well.  While Dinh may not have accurately testified about the length of time she spent with Hooks, Hooks offers no evidence to suggest that

her testimony regarding her observations during the time she did spend with him were inaccurate.[12]  Proposition IV is denied.

Hooks, 126 P.3d at 642-43 (footnotes omitted).

Petitioner asserts here, as he did in state court, that it was a violation of his right to confrontation to not be allowed to impeach Ms. Dinh on cross-examination with prior inconsistent statements regarding her living arrangements with Petitioner and with her prior statements regarding whether Shalimein Blaine was a prostitute for Petitioner.[13]

> The confrontation clause of the sixth amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." United States v. Bartlett, 856 F.2d 1071, 1088 (8th Cir. 1988) (quoting Davis v. Alaska, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974)).  The right of confrontation means more than being allowed to confront the witness physically. Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S.Ct. 1431, 1434, 89 L.Ed.2d 674 (1986) (citing Davis, 415 U.S. at 308, 94 S.Ct. at 1105). The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. Davis, 415 U.S. at 315, 94 S.Ct. at 1109.  There are limits to the right to cross-examination which the confrontation clause guarantees, however. United States v. Risnes, 912 F.2d 957, 959 (8th Cir.1990).  "[T]rial judges retain wide latitude insofar as the

---

[12]  Dr. Hall had relied on Dinh's statements in the presentence report for some of her findings.  In those statements Dinh claimed she had lived with her husband during the time period of this crime.  Subsequent investigation indicates that Dinh's husband had filed for divorce, claiming abandonment, and that Dinh filed a protective order against her husband during that time. Counsel did not attempt to question Dinh about these discrepancies during the mental retardation proceedings, but suggests on appeal that this information should have been used to impeach Dinh's credibility.  We find that this information resembles the lines of questioning discussed above.
Hooks, 126 P.3d at 643 n. 21.

[13]  Petitioner asserts prior statements by Ms. Dinh to probation officers regarding the length of time she was in foster care, her close relationship with her foster mother, and living with her husband Cuc Van Dinh in 1991 were inconsistent statements improperly kept from the jury's consideration as possible impeachment.

Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." <u>Van Arsdall</u>, 475 U.S. at 679, 106 S.Ct. at 1435.  Indeed, in <u>Delaware v. Fensterer</u>, the Supreme Court held that "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (<u>per curiam</u>) (<u>citing</u> <u>Ohio v. Roberts</u>, 448 U.S. 56, 73 n. 12, 100 S.Ct. 2531, 2543 n. 12, 65 L.Ed.2d 597 (1980)) (emphasis in original).

A1leged confrontation clause errors are subject to harmless-error analysis. <u>Van Arsdall</u>, 475 U.S. at 684, 106 S.Ct. at 1438. As the Supreme Court has stated:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.  Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts.  These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

<u>Id.</u> (<u>citing</u> <u>Harrington v. California</u>, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); <u>Schneble v. Florida</u>, 405 U.S. 427, 432, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972)).

<u>United States v. Crump</u>, 934 F.2d 947, 950-51 (8th Cir. 1991).

At the mental retardation trial, defense counsel on cross-examination attempted to impeach Ms. Dinh's credibility by asking her where her parents were when she first met Petitioner.  The trial court sustained the state's objection, stating that the question did not go

to her credibility and that the focus of the questioning should be regarding Petitioner's adaptive living. (Tr., Vol. IV, p. 216.)  Later, the trial court restricted counsel's questions from a 1991 presentence report regarding Ms. Dinh, including portions based on conversations with Ms. Dinh's foster mother, sustaining the state's objections on the grounds of hearsay.  Counsel did inquire whether or not it was true that Ms. Dinh was in foster care in 1985, to which she agreed. (Tr., Vol. IV, pp. 218-20.)   Ms. Dinh had earlier testified that when she was in foster care she was not living with Petitioner. (Tr., Vol. IV, p. 217.)

Petitioner was able to cross examine Ms. Dinh about her observations of Petitioner daily functioning.  As stated by the OCCA, Petitioner did not demonstrate the excluded questioning pertained to material issues regarding Petitioner's mental abilities.  Petitioner has not demonstrated that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

b.  Failure to allow evidence of Dr. Murphy's disciplinary proceedings.

Petitioner next claims that the trial court's refusal to admit evidence of Dr. Phillip Murphy's disciplinary proceedings violated his right to due process and a fair trial.  The OCCA considered Petitioner's claim on the merits and denied relief:

> Hooks claims in Proposition V that the trial court erred in refusing to admit evidence that Dr. Philip Murphy had been professionally disciplined. Dr. Gelbort testified that records showed Dr. Murphy had tested Hooks in 1988, with an IQ score of 80.  Apparently to cast doubt on the validity of that score, counsel wanted to question Dr. Gelbort regarding his knowledge that Dr. Murphy had subsequently been professionally disciplined.  Counsel attempted to do this using a document from the Oklahoma Board of Psychologists which counsel had given Dr. Gelbort the night before, but which had not been provided to opposing counsel.  The trial court sustained the

prosecutor's objection, holding that the failure to provide the document was a discovery violation. We agree with the trial court's ruling that this was not impeachment evidence. The trial court found that, as counsel had talked with Dr. Gelbort about Dr. Murphy and his reputation in the medical community, and using the document to discredit Dr. Murphy, counsel should have provided the document in discovery. This decision was not an abuse of discretion. Hooks completely fails to show that prohibition of the evidence was an unduly harsh sanction for a discovery violation. As our discussion above shows, Hooks's IQ tests covered a wide range. The information regarding many of the tests, including Dr. Murphy's, was sparse. Neither the State nor defense experts relied on Dr. Murphy's test in forming their opinion regarding Hooks's mental abilities. In fact, only Dr. Gelbort mentioned Dr. Murphy's test. The record does not indicate that information discrediting Dr. Murphy could have affected the jury's determination. This proposition is denied.

Hooks, 126 P.3d at 643 (footnotes omitted).

The pertinent question here on habeas review is "whether the ruling deprived [Petitioner] of 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (italics in original)." Sellers v. Ward, 135 F.3d 1333, 1342 (10th Cir. 1998). Petitioner has not demonstrated that the discovery sanction denied him of an opportunity of effective cross-examination, or that it denied him a fair trial or due process of law. Petitioner was not attempting to cross-examine his expert witness, but was instead attempting to use a 1999 professional discipline proceeding of Dr. Murphy to impeach Dr. Murphy's 1988 test score. The expert witnesses, however, did not rely on that test or on another test indicating an I.Q. result of 56, as both were outlying test scores from all of the others and because little was known about the testing procedures used and the scoring methods employed. Although the prosecutor questioned

Petitioner's expert about Dr. Murphy's test and it's resulting score, the questioning centered more on determining which test he performed (Tr., Vol. III, pp. 135-42, 174-76) and hypothetical questions pertaining to the normalcy of a range of I.Q. scores between 61 and 80. (Tr., Vol. II, pp. 116-17)  Petitioner has not demonstrated the OCCA's determination to be contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

### c.  Introduction of Irrelevant and Prejudicial Evidence

Petitioner claims the state was allowed to introduce prejudicial and irrelevant evidence in violation of Lambert v. State, 71 P.3d 30 (Okla. Crim. App. 2003),  resulting in an unfair trial in violation of Atkins.

### I.  Prostitution Evidence

Petitioner first claims that evidence introduced by the state of a prostitution ring was based on unreliable testimonial evidence of Shanna Allen Dinh, was not relevant to the mental retardation determination, and any probative value the evidence may have had was substantially outweighed by its prejudicial effect.  The OCCA considered Petitioner's claim and denied relief:

> As we indicated in Lambert, we are wary of attempts to introduce evidence of crimes for which a petitioner has been convicted.  Reciting the facts of particular crimes will seldom be relevant to the issue of mental retardation, but may well confuse and inflame the jury.  For the same reason, Lambert did not contemplate the introduction of factual evidence of unadjudicated crimes.  However, we recognized that evidence of particular kinds of criminal activity may be relevant to the issue of mental retardation.

This is such a case.  The State introduced evidence that Hooks employed several women as prostitutes.  In the course of that employment, he rented apartments, purchased food and other supplies, oversaw the women's activities, required that they give him their earnings, took responsibility for that money, and enforced rules regarding behavior, housecleaning, and personal hygiene.  All this directly bears on Hooks's mental abilities.  While experts agree that mentally retarded people can commit crimes, categories of crime differ.  On one hand, individual acts of violent crime, such as armed robbery or rape, require little or no abstract thought or complex planning.  By contrast, running a prostitution ring over a period of several years resembles engagement in a continuing criminal enterprise.  This requires a level of abstract thought, coupled with the ability to carry out plans, which might be beyond the capabilities of a mentally retarded person.  The trial court scrupulously limited this evidence, focusing on those aspects which have some bearing on Hooks's mental abilities.  Under these circumstances, the evidence was relevant to the issue of mental retardation and not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or any other factor bearing on admissibility.  The trial court did not abuse its discretion in admitting this evidence.

Hooks, 126 P.3d at 644 (footnotes omitted).

Atkins determined that it was unconstitutional for the State to take the life of a mentally retarded offender.  Although the Supreme Court left to the States the task of developing appropriate ways to enforce this constitutional restriction, it noted that clinical definitions of mental retardation also require significant limitations in adaptive skills such as "communication, self-care, and self direction", and by definition have "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Atkins, 536 U.S. at 318.  The evidence presented by the State, although partially involving possible prior activity involving prostitution, was directly relevant to counter Petitioner's claim of significant limitations in adaptive functioning by

demonstrating the tasks in which Petitioner participated and his ability to perform those tasks on a routine basis. Petitioner has not demonstrated that the evidence was more prejudicial than probative, or that either the admission of this evidence or the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

### ii. Prior Crimes Evidence

Petitioner next claims in a cursory fashion that admission of both adjudicated and unadjudicated crimes was irrelevant to mental retardation and qualified as evidence prohibited by the OCCA's decision in <u>Lambert v. State</u>, 126 P.3d 646 (Okla. Crim. App. 2005). Respondent responds that this claim has never been presented to the state court and is, therefore, unexhausted. Petitioner does not dispute Respondent's assertion in his Reply. Petitioner specifically claims that the jury was made aware that he was "convicted of armed robbery, arrested on a separate robbery charge and in many domestic disputes, got into numerous fights while in custody, and made a weapon while in custody", citing to the testimony of Dr. Terese Hall regarding her review of Petitioner's prior medical records and Department of Corrections records. (Pet. at 52.) Apart from Petitioner's claim regarding admission of evidence of a prostitution ring, this claim made by Petitioner here has not been presented to the state court, has not been exhausted, and is, therefore, barred from habeas review. 28 U.S.C. § 2254(b)(1).

Despite that fact, an application for a writ of habeas corpus may be denied on the

merits despite Petitioner's failure to exhaust his remedies in state court. 28 U.S.C. § 2254(B)(2). In the instant case, any reference to prior adjudicated or unadjudicated crimes during Dr. Hall's testimony were made merely to explain where the records were from and why Petitioner had been evaluated. Her testimony was more focused on notations regarding Petitioner's activities while being evaluated at Eastern State Hospital and while in the custody of the Department of Corrections, events leading the hospital officials to suspect malingering by Petitioner, and evaluations that he not only was not mentally retarded but very intelligent, aggressive and dangerous. (Tr., Vol. V, pp. 26-29.) Dr. Hall's testimony of Petitioner's past evaluations and actions was not only relevant to her expert opinion, but also to demonstrate evidence countering Petitioner's claims of limitations in adaptive functioning.[14]

### iii. 1988 Statement to Detective Mullenix

Petitioner asserts that testimony from Detective Eric Mullenix regarding a statement Petitioner gave to the police before his 1988 arrest permitted the State to present enough evidence to allow the jury to be informed that he had committed a murder. Petitioner claims this evidence was not relevant to the issue of mental retardation and is contrary to the goal set forth in Lambert, 126 P.3d at 659. Petitioner primarily objects to the following portions of Detective Mullenix's testimony regarding Petitioner's statement and what law enforcement actually found when they arrived at the residence:

---

[14] Dr. Hall's testimony was not objected to at trial.

Q.   Okay.  Is there anything else about what Victor Wayne Hooks told you that caused you concern?
A.   Well, we found evidence that the apartment had been cleaned prior to our arrival.  We found a bucket that was still damp with water.  We found damp carpet that looked like it had been recently cleaned.  We found that the trash inside the apartment had been recently emptied.  And then when we checked the dumpster in the back of the residence of the apartment complex we found evidence in that dumpster that we knew to have come from the apartment.
Q.   Okay.
A.   All of that indicated to us that the crime scene was in the apartment.
Q.    And this was contrary to the information that was provided to you by Victor Wayne Hooks; is that correct?
A.   It is.

(Tr., Vol. V., p. 161.)

The OCCA considered all of Detective Mullinex's testimony with Petitioner's claim

and denied relief:

> The trial court was equally vigilant regarding the transcript of Hooks's statements to Officer Mullenix before his arrest.  The admitted portions of this interview do not contain any facts of the crime itself.  In fact, there is no reference to the crime; these statements cover Hooks's thoughts and actions over a period of time before the crime was committed.  Hooks describes the errands he had just run, including fixing a muffler, getting a security deposit back from a former landlady, and going to the store.  He talks about his conversation with his wife about money, asking for her help in paying bills and retrieving things from the pawnshop.  Hooks explains he pawned things to get diapers, groceries, and "material things" like a television.  He describes his efforts to work, his relations with his wife and in-laws and his own family, and his feelings as he expressed them to his wife.  All this goes to Hooks's ability to understand and process information, to communicate, to function in society, and to care for himself and others.  These are factors in the Murphy definition of mental retardation.  The trial court did not err in admitting this evidence.

Hooks, 126 P.3d at 644 (footnotes omitted).

Petitioner's assertion that the OCCA's determination is contrary to it's previous

decision in <u>Lambert</u> is unavailing.[15]  In <u>Lambert</u>, testimony was admitted over objection of two witnesses who were allowed to testify at length regarding specific details of two unadjudicated crimes, including holding them against their will, physical violence, and crimes committed upon their bodies.  <u>Lambert</u> at 655 n. 32.  Here, however, specific facts pertaining to the crime were not presented to the jury.  As recognized by the OCCA, Petitioner's statement to the police and Detective Mullinex's testimony pertained primarily to information regarding Petitioner's ability to process and understand information, to plan, to communicate and to function in society - all factors in the definition of mental retardation and all relevant to the issues at trial.  Petitioner has not demonstrated that the OCCA's determination was contrary to, or an unreasonable application of, clearly established Supreme Court law.

### 4.  Alleged <u>Brady</u>/<u>Giglio</u> violation.

Petitioner claims exculpatory information was in the possession of the prosecutor but never revealed to his defense counsel.  Pat Prater was a Department of Corrections employee and Petitioner's counselor/case manager from 1993 until August of 2003.  On June 14, 2004, after the mental retardation trial had commenced, the prosecutor provided Petitioner's counsel with the following memorandum of her phone conversation with Pat Prater:

> I am unable to be there this a.m., as early as we discussed, and therefore am conveying this thought in writing to insure that I do not forget to tell you.  In speaking with case managers that have handled your client while at OSP, I

---

[15]  To the extent the OCCA's determination differs from it previous decision in <u>Lambert</u>, habeas relief does not lie for errors in state law. <u>Estelle v. McGuire</u>, 502 U.S. 62 (1991).

spoke with Pat Prater.  When I asked her if she thought Victor Hooks was MR, her response was, "I wouldn't be surprised, because he talks like one".  "You know how they talk?  He talks like that".  She could not give any other detail, just that he "talks like one".

I just wanted to pass that along to you.  She no longer works in H-Unit, but I got her on the phone by calling 918-423-4700 and asking for her.

I will be there shortly, please be nice to James.

(Attachment 25 to Petitioner's Petition.)

In December of 2004, Petitioner's habeas counsel and George Rawlings, an investigator with the Federal Public Defender's office, interviewed Ms. Prater.  Mr. Rawlings executed an affidavit regarding Ms. Prater's statements during the interview.  According to Mr. Rawling's affidavit, Ms. Prater had a more detailed conversation with the prosecutor than set forth in the memorandum, and that in her opinion, based on the dealings she had with him, Petitioner was mentally retarded. Id.

The procedural aspect of this case is slightly unusual due to the somewhat unique circumstances involved in raising Petitioner's mental retardation claim.  While in federal court on appeal from denial of habeas relief, the Supreme Court decided Atkins.  Petitioner filed a second request for post-conviction relief with the OCCA based on Atkins.  The Tenth Circuit stayed Petitioner's appeal and allowed him to file a second or successive habeas corpus petition.  Petitioner's mental retardation trial was conducted as part of his second post-conviction.  After the trial, the parties filed supplemental briefs with the OCCA, similar in character to briefs on appeal.  In his *Supplement to Supplemental Brief After Remanded Mental Retardation Trial*, Petitioner's first proposition of error was a claim that the evidence presented at the trial was sufficient to prove Mr. Hooks is mentally retarded.  Petitioner

added for the first time that the state (with the knowledge that at least one prison official (Pat Prater) believed Petitioner to be mentally retarded) argued in closing that one of Petitioner's expert's conclusions was not accurate because she did not review Petitioner's prison records. Petitioner stated in his brief in the state court at the end of his claim of sufficient evidence to prove mental retardation:

> Had undersigned counsel been aware of the extent of Ms. Prater's opinion of Mr. Hooks, counsel would have attempted to subpoena her to testify in rebuttal at the mental retardation trial. This information would have negated the state's inferences that Mr. Hooks was malingering and manipulating his condition. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To the extent that failure to call Ms. Prater as a witness was the fault of counsel, then counsel was ineffective. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); United States v. Cronic, 466 U.S. 648, 104 S.Ct.2039, 80 L.Ed.2d 657 (1984).

(Hooks v. State, PCD-2002-980, Petitioner's Supplement to Supplemental Brief After Remanded Mental Retardation Trial, p.3.)

Petitioner later filed a third application for post-conviction relief. In it's unpublished Opinion, the OCCA determined:

> In Proposition I Hooks claims that his right to due process under the federal and Oklahoma constitutions was violated when prosecutors failed to turn over potentially exculpatory evidence to defense counsel. At the start of trial, the prosecutor handed defense counsel a note briefly describing a conversation between the prosecutor and one of Hooks's former prison case managers, Pat Prater. The note included Prater's name and contact number, and stated that Prater wouldn't be surprised to learn that Hooks was mentally retarded because he talked like a retarded person. Hooks first claims that the prosecutor's failure to include other details of the conversation, reinforcing the manager's belief that Hooks could be retarded, amounts to a violation of his right to exculpatory evidence under Brady v. Maryland. Hooks could have raised this issue in his supplemental post-conviction brief to this Court after the mental retardation proceeding was held. In an additional supplemental

brief filed in those proceedings, Hooks mentioned the evidence as part of his claim that he had presented sufficient evidence to show that he was mentally retarded. In that supplemental brief, when discussing this evidence, Hooks did not specifically claim that his right to exculpatory evidence was violated, but he did cite to <u>Brady</u>. This claim could have been raised in a previous post-conviction proceeding. It is barred from our consideration under the limits of the subsequent post-conviction statute.

<u>Hooks v. State</u>, PCD-2006-350, slip op. at 4-5 (Okla. Crim. App. Oct. 10, 2006)(footnotes omitted).

Respondent argues that because the OCCA determined that this claim was procedurally barred, this Court must deny Petitioner's claim on habeas review. A review of the adequacy of the state bar on post-conviction is not necessary, however, as the Court can deny the issue on substantive grounds. 28 U.S.C. § 2254(b); <u>Revilla v. Gibson</u>, 283 F.3d 1203, 1210-11 (10th Cir. 2002).

In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> at 87. In order to establish a <u>Brady</u> violation, Petitioner must establish (1) suppression of evidence by the prosecution; (2) of favorable evidence to the accused; and (3) the evidence was material to the defense. <u>Id.</u>, <u>see also Banks v. Reynolds</u>, 54 F.3d 1508, 1516 (10th Cir. 1995). The prosecution is not required, however, to make a complete and detailed accounting to the defense of all police investigatory work on a case, nor must it disclose possible theories of the defense to the defendant. <u>Banks</u>, 54 F.3d at 1517. "The Constitution, as interpreted in <u>Brady</u>, does not require the prosecution

to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Secretary of New Mexico Dept. Of Corrections, 50 F.3d 801, 823-24 (10th Cir. 1995). "Due process only requires the disclosure of material exculpatory evidence which, 'if suppressed, would deprive the defendant of a fair trial.'" Id. (quoting U.S. v. Bagley, 473 U.S. 667, 675 (1985)).

This is not a situation where the prosecutor entirely suppressed evidence. Here, Petitioner alleges suppression of the *extent* of the prosecutor's conversation with Pat Prater. Although it may not have contained a complete and detailed accounting of the conversation, the memorandum given to counsel by the prosecutor did include the name and phone number of Ms. Prater, as well as a statement of her opinion that she wouldn't be surprised that Petitioner was mentally retarded because he "talks like one". The memo indicates that Ms. Prater's opinion was favorable to Petitioner - an opinion of an employee of the Corrections Department who had contact with Petitioner over a period of time during his incarceration.

Regarding the second prong of Brady, it is probably without question that the additional opinion of Ms. Prater asserted in the federal investigator's affidavit is favorable to the accused. Most additional evidence appears favorable, especially in hindsight. In this instance, the additional opinion pertains to other examples of possible significant deficits in Petitioner's adaptive functioning. Many, however, are cumulative of other evidence and testimony presented at trial.

Lastly, the evidence must be shown to be material. In a trial on the issue of mental retardation, the burden is placed on Petitioner to prove the elements of the legal definition

of mental retardation. The prosecution need only present evidence to disprove the assertions of the claimant. In this instance, trial counsel neither listed as witnesses nor presented for testimony anyone associated with the Department of Corrections, whether an employee or an inmate. Counsel presented no direct evidence regarding Petitioner's adaptive functioning while incarcerated. The prosecution was under no obligation to present "possible theories of defense", or in this case, possible avenues available to prove the necessary elements to establish legal mental retardation. Petitioner has not demonstrated that the purported partial disclosure of the prosecutor's conversation with Pat Prater denied him due process or a fair trial.

### 5. Ineffective Assistance of Trial Counsel

Petitioner asserts that the counsel assigned to present his mental retardation claim in state court failed to provide effective representation. He first claims that the procedures established by the OCCA, combined with the allocation of staff and resources by the Oklahoma Indigent Defense System, deprived him of effective representation in violation of United States v. Cronic, 466 U.S. 648 (1984). To support his claim, Petitioner states that his counsel was unprepared for trial and lacked the proper training and skill. He asserts that counsel did not have adequate time to investigate or prepare for his trial due to other obligations regarding three other death row inmates' mental retardation trials in the four months prior to his trial.[16] Additionally, Petitioner asserts that the procedures established by

---

[16] Although three other mental retardation trials in the four months previous to his trial could lend support to a claim of inadequate preparation, it also could dilute a claim of lack of

the OCCA failed to provide an adequate review of his attorney's performance.

> The Supreme Court in <u>Cronic</u> recognized that in rare instances it may be appropriate to presume prejudice "without inquiry into counsel's actual performance at trial," because the circumstances "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." <u>Cronic</u>, 466 U.S. at 658, 662, 104 S.Ct. 2039. Circumstances that justify a presumption of prejudice include the absence of counsel at a critical stage of trial, the denial of the right to effective cross-examination, and the complete failure to subject the prosecution's case to adversarial testing; but, as the Supreme Court points out, a presumption of prejudice is the exception, not the rule. <u>Id.</u> at 659, 104 S.Ct. 2039.

<u>Cooks v. Ward</u>, 165 F.3d 1283, 1295-96 (10th Cir. 1998).

<u>Cronic</u>'s "presumed prejudice" is only applicable in those cases where the attorney

abandoned the required duty of loyalty to his client and acted with reckless disregard:

> As noted above, <u>Strickland</u> requires a showing of both deficient representation and prejudice. In a narrow class of cases, however, including when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," <u>United States v. Cronic</u>, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), prejudice is presumed. In order to presume prejudice under <u>Cronic</u>, "the attorney's failure to test the prosecutor's case must be complete." <u>Bell</u>, 535 U.S. at 686, 122 S.Ct. 1843. This Court has repeatedly found the <u>Cronic</u> presumption inapplicable where "counsel actively participated in all phases of the trial proceedings." <u>Snyder v. Addison</u>, 89 Fed.Appx. 675, 680 (10th Cir.2004); <u>see also</u> <u>Cooks v. Ward</u>, 165 F.3d 1283, 1296 (10th Cir.1998) (<u>Cronic</u> inapplicable where "[counsel] was present in the courtroom[,] . . . conducted limited cross-examination, made evidentiary objections, and gave a closing argument"); <u>Hooper v. Mullin</u>, 314 F.3d 1162, 1175 (10th Cir.2002) (<u>Cronic</u> inapplicable where "[d]efense counsel cross-examined the State's guilt-stage witnesses, made objections to the State's evidence, presented some evidence in Petitioner's defense, and made opening and closing arguments"). In fact, we have found a complete absence of meaningful adversarial testing only where the evidence "overwhelmingly established that [the] attorney abandoned the required duty of loyalty to his

---

experience, proper training and skill.

client," and where counsel "acted with reckless disregard for his client's best interests and, at times, apparently with the intention to weaken his client's case." Osborn, 861 F.2d at 629.

Turrentine v. Mullin, 390 F.3d 1181, 1207-08 (10th Cir. 2004)(footnotes omitted).

Petitioner's representation and trial were not a complete failure of adversarial testing. Petitioner's counsel was present in the courtroom throughout his mental retardation trial, presented evidence, conducted cross-examination, and made opening and closing arguments. Cronic's presumed prejudice standard is not, therefore, the proper standard to apply. See Florida v. Nixon, 543 U.S. 175 (2004).

The Supreme Court set forth the proper standard for determining ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).

In Strickland, the Supreme Court held that "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." 466 U.S. at 687, 104 S.Ct. 2052. "First," the Court noted, "the defendant must show that counsel's performance was deficient." Id. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. "Second," the Court noted, "the defendant must show that the deficient performance prejudiced the defense." Id. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. "Unless a defendant makes both showings," the Court held, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id.

Gilson v. Sirmons, 520 F.3d 1196, 1245 (10th Cir. 2008).

### a. Failure to Obtain Current I.Q. Test

At Petitioner's trial, several IQ scores were presented to the jury. The parties and their experts agreed that a 1994 score of 72 achieved by Petitioner on the Wechsler Adult

Intelligence Scale - Revised (WAIS-R) test administered by Dr. Gelbort was the most reliable test and score. Pursuant to the language in the Supreme Court's <u>Atkins</u> opinion, the jury was instructed with the AAMR and APA definitions of mental retardation. The definitions require as one factor of mental retardation that a person demonstrate an I.Q. score of seventy (70) or below.

At the mental retardation trial, Petitioner's counsel presented expert testimony and argued that the score of 72 met the definitional requirement when considered with the standard error of measurement and a scientific theory known as the "Flynn Effect". Expert testimony revealed that the standard error of measurement was a plus or minus of five (5) points. When the standard error of measurement was applied to Petitioner's score, his I.Q. could have been as low as 67 - or as high as 77. Further, Dr. Gelbort testified that the "Flynn Effect" had proven that I.Q. scores were rising over time, requiring I.Q. tests to be re-normed to remain an accurate reflection of a person's I.Q. He testified that Petitioner would likely score lower if he were administered a current version of the test previously given.

Petitioner claims trial counsel was ineffective for failing to have him retested prior to the 2004 mental retardation trial. Petitioner provides in an attachment to his Petition an affidavit of trial counsel stating that no trial strategy existed for the failure, but rather that the omission was attributable to lack of time. (Attachment 30 to Petitioner's Petition, ¶ 12.)

In March of 2006, the Wechsler Adult Intelligence Scale, 3rd Edition (WAIS-III) was administered to Petitioner by Dr. Cynthia Hartung. Petitioner achieved a full scale I.Q. score of 67. Dr. Hartung prepared a report which was later reviewed by the state's witness, Dr.

Terese Hall. Petitioner asserts that Dr. Hall revised her trial testimony that Petitioner's scores placed him in the borderline range of functioning to an opinion that his scores placed him in the mildly retarded range of functioning.[17]

The OCCA thoroughly considered Petitioner's claim and determined that he had not demonstrated the necessary prejudice component of the <u>Strickland</u> standard:

> Hooks claims counsel was ineffective in failing to have Hooks's IQ tested before the mental retardation trial. Hooks presented evidence of nine IQ tests, from first grade to the months before the mental retardation proceeding, with scores ranging from 53 to 80. In the latest test presented to the jury, conducted by Dr. Hall, as State's expert, Hooks had an unreliable result of 53. Hooks had a history of not cooperating when taking IQ tests, some tests may have been irregularly administered, and some scores may have reflected health or emotional problems Hooks may have had at the time of those tests. The experts agreed that the most reliable test was administered in 1994, with a score of 72. The experts at Hooks's trial agreed that, given the 5-point standard error of measurement in the test scores, Hooks was in a gray area. While some experts noted Hooks's reliable score of 72 could have been slightly inflated, nothing before this Court now or from the district court proceedings suggests that the score inflation would have been significantly outside the standard error of measurement. Counsel did not arrange for Hooks to be tested by a defense expert before the mental retardation proceedings. Counsel avers that this was due to lack of time, and that a subsequent test showed a score of 67.

> Counsel fails to show that Hooks was prejudiced by this omission. Counsel relies on an affidavit by Dr. Hall. Dr. Hall had testified for the State that she believed Hooks functioned in the borderline range. After reviewing the most recent IQ test, Dr. Hall avers that she would now say Hooks falls within the mild mentally retarded to borderline range, based on the evidence

---

[17] The exact language from Dr. Hall's affidavit reads as follows:

7.      Taking into consideration the most recent test administration, it is *possible* Mr. Hooks meets the "significantly subaverage intellectual functioning" requirement of the AAMR definition of mental retardation and the first prong of the Oklahoma definition of mental retardation.

(Attachment 24 to Petition, March 14, 2006 Affidavit of Dr. Terese Hall, ¶ 7)(emphasis added).

that the two most apparently reliable scores, of 67 and 72, are within the upper end of the mild mentally retarded range and the lower end of the borderline range. Dr. Hall stated that it is "possible" Hooks meets the requirement of significantly subaverage intellectual functioning necessary for a finding of mental retardation for capital proceedings. Assuming that Hooks would have had the same test results as he did when tested after the mental retardation proceedings, we cannot say that counsel's failure to have Hooks tested before those proceedings undermines our confidence in the outcome of the case. Jurors were presented with a wide range of IQ scores, most of which placed him somewhere in the gray area between borderline functioning and mentally retarded. Jurors also considered other evidence showing Hooks's intellectual and adaptive functioning were above the deficits required for a finding of mental retardation. The new test results and Dr. Hall's new opinion do not constitute such significant changes from the evidence presented that, taken into account with other evidence, jurors would have reached a different conclusion. As Hooks fails to show prejudice, we will not find counsel ineffective for this lapse.

Hooks, PCD-2006-350, slip op. at 8-10 (Okla. Crim. App. Oct. 10, 2006)(footnotes omitted).

In order to establish prejudice, Petitioner must show "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Wong v. Belmontes, 130 S.Ct. 383, 386 (2009)(quoting Strickland, 466 U.S. at 694). The OCCA considered the new test score and new expert opinion, together with the evidence presented at the trial, and determined that the newer test results would not have caused jurors to reach a different conclusion. Whether or not this court agrees with this determination or might consider it erroneous, the inquiry on habeas review is whether the determination was unreasonable. Williams v. Taylor, 529 U.S. 362, 411 (2000). Petitioner has not demonstrated the OCCA's determination to be unreasonable.

b. Failure to Investigate Petitioner's Adaptive Functioning on Death Row

Petitioner contends trial counsel was ineffective for failing to conduct an investigation

regarding his adaptive functioning while he was on death row and to discover evidence to counter the state's evidence.

### 1. Letter's to Petitioner's Daughter

Evidence was introduced of letters to Petitioner's daughter, Shalimar Plumley, written while Petitioner was incarcerated on death row. Petitioner contends the letters were very damaging to his case because they were used to demonstrate that he could read and write, and were also used to support the state's argument that he possessed sufficient intellectual ability to plan and scheme. Petitioner asserts that he did not compose the letters without assistance, that he was not responsible for a plot to defraud mentioned in the letters, and that the affidavits of jurors[18] admitted with his Petition demonstrate the letters influenced their decision and had a damaging effect on his claim of significant deficits in adaptive functioning.

Petitioner's counsel made several references during the trial that Petitioner may have had assistance in writing the letters, but offered no direct support for her contention. Petitioner argues that Dr. Hall concluded that the letters were written by Petitioner and testified that they included fairly advanced vocabulary and concepts, despite a response to defense counsel that she did not know whether or not he had someone help him write or

---

[18] Evidence, either through testimony or affidavit, of the effect of anything upon a juror's mind or emotions influencing the juror or concerning his mental processes in connection therewith is not permitted in a federal habeas proceeding. See Fed. R. Evid. 606(b); Capps v. Sullivan, 921 F.2d 260, 262-63 (10th Cir. 1990).

compose the letters.[19]  In further support of his contention, Petitioner offers the affidavit of inmate Paris Powell.  In his affidavit, Mr. Powell asserts he often helped Petitioner write and compose the letters.  Petitioner claims counsel's failure to present this evidence in support of his significant deficits in adaptive functioning was ineffective representation by counsel. Petitioner also claims the failure to present this evidence constitutes ineffective assistance because it allowed the state to use the letters against him and allowed trial court rulings on the matter that were damaging and prejudicial to his claim.[20]

The OCCA determined that Petitioner failed to demonstrate he was prejudiced by counsel's failure to present this evidence at trial:

> Hooks next claims counsel was ineffective for failing to investigate Hooks's adaptive functioning abilities while he was on death row.  Hooks first discusses his letters to his daughter, which the prosecution relied on in the mental retardation proceedings.  Witnesses testified that the letters were in Hooks's handwriting.  However, Hooks claimed at the time, and continues to claim, that he did not write the letters by himself and they do not accurately reflect his capabilities.  Hooks also claims that one of the letters referred to a scheme to solicit money which did not occur.  Hooks claims counsel was ineffective in failing to put on any witnesses to substantiate these claims. Hooks's expert testified, and counsel argued, that Hooks had help with the letters and their value should be discounted.  In closing argument, the prosecutor quoted the letters extensively and noted that there was no evidence

---

[19]  Petitioner's assertion is incorrect.  Dr. Hall's testimony quoted by Petitioner references a response to a question regarding a portion of a letter about a scheme to defraud.  Earlier in her testimony, Dr. Hall responded to a specific question whether she knew if Petitioner wrote the letters by himself, stating that Petitioner had told her that he "wrote them with some assistance on vocabulary and so forth from his friends." (Tr., Vol. V., p. 101.)

[20]  Petitioner attempts to bolster his claim of the prejudicial impact of the trial court's rulings by stating in one instance that the court's ruling was "in the presence of the jury." (Pet. at 81.) Review of the transcript reveals instead that the court's ruling was made at the bench and out of the hearing of the jury. (Tr., Vol. V., p. 117.)

Hooks had any help writing them.

Hook has submitted materials which he contends counsel could have discovered and should have used, in support of this claim. He attached an affidavit from Paris Powell, a fellow prisoner, to his second supplemental brief to the second post-conviction application, and again to this post-conviction application. Powell avers that he often helped Hooks with routine written requests and composed letters to Hooks's family for him to copy. Hooks submits prison records to show that references to visitors and money regarding the solicitation scheme are not supported by records of visits or deposits in Hooks's prison account. These materials are offered to show that (a) Hooks did not compose the letters himself, and (b) the solicitation scheme did not happen as he describes it in a letter.

The State argues that, despite counsel's affidavit stating otherwise, counsel made a reasonable strategic decision not to present this evidence. We need not search the record for strategic reasons counsel may have had to avoid presenting this evidence. Hooks fails to show he was prejudiced by counsel's failure to present it. The letters to his daughter, and the description of a scheme he may or may not have carried out in prison (whether as described in the letter or in some other form), were significant to the State's case. However, the State presented other significant evidence bearing on Hooks's intellectual and adaptive functioning, including ability to communicate and plan. Among other things, witnesses testified regarding Hooks's ability to hold a job, care for his family, and run a prostitution ring. Witnesses all agreed that, whether or not Hooks had help composing the letters to his daughter, that was his handwriting and his penmanship, and the content of the letters appears to reflect his sentiments if not his words. We cannot conclude that counsel's omissions deprived Hooks of a fair trial with reliable results.

Hooks, PCD-2006-350, slip op. at 10-12 (Okla. Crim. App. Oct. 10, 2006)(footnotes omitted).

As detailed by the OCCA, the state presented significant evidence bearing on Petitioner's abilities and adaptive functioning. Petitioner's statement to the police corroborated the testimony and evidence presented by the state regarding leasing of apartments, payment and return of lease deposits, and sales and repurchasing of property at

pawn shops. As to the source of the letters, testimony was presented by Dr. Hall that Petitioner had told her he had written the letters himself.

Considering the totality of the testimony and evidence presented at trial with the assertions of Petitioner here, Petitioner has not demonstrated that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law, or that its adjudication of Petitioner's claims resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at trial.

### 2. Information regarding Pat Prater

As discussed earlier in reference to Petitioner's <u>Brady</u>/<u>Giglio</u> claim, the prosecution presented to Petitioner's counsel during trial a memorandum of a conversation with Pat Prater. Ms. Prater was Petitioner's counselor and case manager from 1998 to August of 2003. Petitioner asserts that the memorandum indicated a strong possibility that an Oklahoma Department of Corrections employee believed he was mentally retarded, and that counsel's failure to contact Ms. Prater to follow up on the memorandum constitutes ineffective assistance of counsel.

The OCCA determined that no prejudice resulted from counsel's failure to contact Ms. Prater:

> Hooks also argues counsel was ineffective for failing to follow up on the prosecutor's information about Pat Prater, Hooks's former case manager who would not have been surprised to learn that Hooks was mentally retarded. Counsel states that she had no strategic reason for failing to contact Prater. Counsel avers the failure was due to the press of time and the limited information in the prosecutor's note, which suggested that Prater's testimony would be of limited value. Hooks submits an affidavit summarizing the

conversation, held after the mental retardation proceedings, between Prater and a defense investigator and federal defense attorney investigating Hooks's claims of mental retardation. According to the affidavit, Prater provided the federal defense team with specific examples of why she thought Hooks was retarded. Hooks's expert, Dr. Cowardin, revised her evaluation of Hooks after reading the affidavit setting forth Prater's opinion. Dr. Cowardin believed that Prater's opinion would have "lent credibility" to the testing data and opinion she gave at Hooks's mental retardation proceedings. However, as the State notes, Dr. Cowardin did not substantially or significantly change her conclusions based on the Prater material. Similarly, there is no indication that Dr. Hall would have changed her opinion had she had Prater's information regarding Hooks's functioning in a prison setting. Prater's observation of Hooks's behavior in prison could have supplemented the observations of Hooks's abilities he offered through family and friends. However, as neither party put on evidence regarding Hooks's ability to function in prison, Prater's testimony would not have countered any State's evidence. Prater's opinion did not cause any expert to substantially revise conclusions as to Hooks's mental abilities, and that evidence would not have contradicted any State's witnesses. We conclude there is not a reasonable probability that, with this evidence, jurors would have found Hooks was mentally retarded.

Hooks, PCD-2006-350, slip op. at 12-14 (Okla. Crim. App. Oct. 10, 2006)(footnotes omitted).

As stated by the OCCA, although a federal habeas investigator presented an affidavit stating Ms. Prater provided examples of why she thought Petitioner was mentally retarded, when presented with the information Dr. Cowardin did not substantially change her conclusions. The information was cumulative of other information presented by Petitioner at trial. Petitioner has not met his burden of demonstrating prejudice as a result of trial counsel's failure to follow up with Ms. Prater, or more importantly, that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law.

### 3. Inmate Paris Powell

Petitioner next claims counsel was ineffective for failing to investigate and present evidence from Paris Powell. Mr. Powell lived "in close proximity" to Petitioner on death row for a majority of the time from 1997 to 2005. (Pet. at 96.) Mr. Powell provided an affidavit describing various instances regarding Petitioner's functioning on death row and of assistance he gave to Petitioner with drafting correspondence. This information and affidavit was provided to the OCCA and considered when it denied Petitioner's claim:

> Hooks claims that counsel should have investigated and called Paris Powell as a witness, not only on the issue of his letters, but to show that he could not function in a day-to-day prison routine without help. Powell completed an affidavit in which he describes helping Hooks fill out canteen claims, helping him write letters, and observing him in daily life. Powell concludes that Hooks was "slow-minded". Again, although Dr. Cowardin used this information in re-evaluating Hooks, it did not significantly affect her conclusions. Hooks presented several witnesses who testified as to his difficulty functioning in daily life. He has not shown he was prejudiced by counsel's failure to use Powell's testimony for this purpose.

Hooks, PCD-2006-350, slip op. at 14 (Okla. Crim. App. Oct. 10, 2006).

As identified by the OCCA, the information proffered through Mr. Powell not only did not significantly affect the expert's conclusions, but was also cumulative of testimony presented at trial regarding Petitioner's daily functioning. Petitioner has not demonstrated that the OCCA's determination of lack of prejudice was an unreasonable application of Strickland.

### c. Failure to Uncover Evidence to Impeach Witness Shanna Allen Dinh

Shanna Allen Dinh testified she met Petitioner when she was thirteen years old and last saw him in 1987. On cross-examination, Petitioner's attorney attempted to question Ms. Dinh about inconsistent statements regarding the time she lived with Petitioner and the time she was in foster homes. The trial court sustained several objections by the state to questions of this nature on grounds of hearsay, questions beyond the scope of direct, and on the grounds of relevancy - that the information sought did not go to the issue of Petitioner's adaptive functioning. (Tr., Vol. IV, pp. 216-21.) Petitioner claims that counsel should have investigated and presented testimony from Cuc Van Dinh, the ex-husband of Ms. Dinh, to discredit Ms. Dinh's testimony regarding the period of time she lived with Petitioner. Petitioner asserts that Mr. Dinh would have testified that he and Mrs. Dinh lived together as a couple from 1985 or 1986 until 1991, and that during that time she was not living with anyone else. The OCCA considered this information and denied relief:

> Hooks claims counsel should have spoken with Cuc Van Dinh, ex-husband of State's witness Shanna Dinh, to develop impeachment evidence. Dinh, who lived with Hooks as a teenager, testified about his conduct with her and the prostitution ring he headed. According to Cuc Van Dinh's affidavit, Dinh was actually living with him during part of the time she testified she was with Hooks. At the mental retardation proceeding, counsel attempted to impeach Dinh through other witnesses, in order to show that she did not live with Hooks as long as she claimed she did. The district court noted that, despite possible discrepancies as to the amount of time Dinh lived with Hooks, she was testifying as to her observations and the parties did not dispute the fact that Dinh observed Hooks over a significant time period, and declined to admit the evidence. Hooks raised this issue in his supplemental brief to this Court from the mental retardation proceedings, attaching a copy of Cuc Van Dinh's affidavit. This Court considered the affidavit in deciding the evidentiary issue. We concluded that the district court did not abuse its discretion, and noted that the affidavit's information "resembles the lines of questioning discussed above", referring to the impeachment evidence not admitted at the

> proceedings. After review, our conclusion remains the same. Whether Dinh lived with Hooks for months or years, her testimony went to her observation of his behavior and mental ability. Hooks has not shown he was prejudiced by counsel's failure to procure Cuc Van Dinh's evidence for impeachment.

Hooks, PCD-2006-350, slip op. at 14-15 (Okla. Crim. App. Oct. 10, 2006)(footnotes omitted).

Ms. Dinh testified to incidents of her observations of Petitioner's functioning ability. She testified Petitioner explained to her how to get a bar card while she was underage in order for her to dance in local clubs, that he negotiated with car salesman over the price of vehicles, that he was able to lease apartments on his own, that he taught her to drive an automobile, and that he could not only read and understand, but also helped her with her homework while she was in school. Mr. Dinh's testimony would have only contradicted Ms. Dinh's statements regarding the amount of time she lived with Petitioner, and would not contradict her testimony of her observations and experiences with Petitioner and his abilities to function. Petitioner has not demonstrated that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law, or was an unreasonable determination of facts in light of the evidence presented at trial.

### d. Failure to Comply with Trial Court's Discovery Order

During the re-direct examination of Dr. Gelbort, trial counsel attempted to introduce evidence pertaining to a 1999 professional disciplinary proceeding regarding Dr. Phillip Murphy. Dr. Murphy tested Petitioner in 1988 and scored him with an I.Q. of 80. Trial counsel attempted to introduce the evidence of the professional discipline in order to discredit

Dr. Murphy's 1988 testing. The State objected on the grounds that the document had not been produced by Petitioner's counsel. The trial court sustained the objection, stating it was not proper for re-direct and that it was a discovery violation. The OCCA determined that Petitioner was not prejudiced by counsel's failure to provide the document to the State:

> Hooks claims counsel was ineffective when counsel failed to give the State information that Dr. Philip Murphy had been professionally disciplined. Dr. Murphy had administered an IQ test to Hooks in 1988, with a score of 80. Neither party called him as a witness, but an expert referred to his test. As a remedy for this discovery violation, the trial court refused to allow Hooks to introduce evidence of the disciplinary action in cross-examining the expert witnesses, to discount their use of Murphy's test results. Hooks claimed in his second post-conviction application that the trial court erred in ruling this was a discovery violation, rather than an attempt at impeachment. This Court upheld the district court's ruling. In doing so, we noted again that Murphy's was one of a range of test scores, that the information about this test was sparse, that no expert relied on it in forming their opinion of Hooks's abilities, and that evidence discrediting Murphy could not have affected the jury's determination. We remain of this opinion. Hooks has failed to show he was prejudiced by counsel's failure to give the State this document.

Hooks, PCD-2006-350, slip op. at 15-16 (Okla. Crim. App. Oct. 10, 2006)(footnotes omitted).

As stated by the OCCA, no expert relied on Dr. Murphy's test scores. Compared to all of the other scores, Dr. Murphy's score was considered an "outlier"- a score that was higher and away from the pack of scores. (Tr., Vol. IV, p. 8.) Additionally, Dr. Gelbort testified that Dr. Murphy's use of the Welcher Adult Intelligence Scale (WAIS) in 1988 instead of the Welcher Adult Intelligence Scale - Revised (WAIS-R) was not the appropriate test to administer as it was significantly outdated at that time. (Tr., Vol. IV, pp. 7-8.) Trial counsel's failure to provide the document to the State did not prejudice Petitioner. Petitioner

has failed to demonstrate the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law.

      e. Failure to Object to or Request State's Exhibits be Redacted.

Petitioner next claims counsel was ineffective for failing to object to letters written by him to his daughter or for failing to request that certain portions of the letters referencing the victim be redacted. Petitioner claims the letters contained several references to the victim and that she was "no longer 'out there' to care for her daughter." (Pet. At 103.) Although Petitioner refers to "letters", only one letter is specifically identified by him. That letter contained the following:

> Anyway, when we was in Court I would Look over at You and See You watching me and it would Tear-at-My-Heart Cause Your "mom" would Look at me The Same Way" "Lord Know's I done everything I Could do To Protect ~ Save her." Shalimar if I Had a Choice She Would be with You now. "I Love You all That Way" I wish I Had'nt Loved Her, maybe She would Still be out there, I don't know.

(Pet. at 103; State's Exhibit No. 6.)

Petitioner includes for support "a recently executed affidavit" of trial counsel stating that she did not review the letters prior to trial and that she now acknowledges the "damaging nature" of them. (Pet. at 103; Attachment 30 to Petition at ¶ 14.)[21]

This issue was presented to the OCCA in Petitioner's Third Application for Post-Conviction Relief:

---

[21] Trial counsel's affidavit states she had, however, thoroughly reviewed the letters at the time of the evidentiary hearing.

Hooks claims counsel should have reviewed the letters to his daughter, and redacted portions "regarding crime facts". The letters are not attached as exhibits to Hooks's Subsequent Application for Post-Conviction, and are thus not part of the record this Court may review. Hooks quotes a portion of one letter in his Application. This paragraph refers to Hooks's wife (and victim) by name, and states, "Lord Know's I done everything I Could do To Protect - Save her", and "if I Had a Choice She Would be with You now." [Application at 43] While it does contain the victim's name, this letter has no references to the facts of the murder of which Hooks was convicted. In her affidavit, mental retardation post-conviction counsel states that after the trial "some" jurors told her the letters mentioned the victim and, upon reading them during deliberation, they realized this was a murder case. The Court is puzzled as to exactly what Hooks expects us to do with this information. The remarks in counsel's affidavit are (a) hearsay and (b) would be inadmissible if contained in a juror affidavit, as descriptions of statements or material affecting deliberations. Nothing properly before this Court suggests that the jury was informed of the facts of the crime, and we will not find counsel was ineffective for failing to review and redact information in the letters.

Hooks, PCD-2006-350, slip op. at 16-17 (Okla. Crim. App. Oct. 10, 2006)(footnotes omitted).

Petitioner states the letters were not attached to his application because they were already part of the record, and that if the OCCA did not have the record before it then this Court owes little deference to the state court determination. It is immaterial, however, whether all the letters were available for consideration by the OCCA. This Court has reviewed the exhibits and finds the letter set out here and at the OCCA by Petitioner is the only one with any allegedly questionable language referring to the murder. The OCCA considered this language contained in the letter in its review.

Petitioner cites to Lambert v. State, 71 P.3d 30 (Okla. Crim. App. 2003)(remand on post-conviction for mental retardation trial), for support that redaction was proper and that

62

the failure of counsel to request it in this case therefore was ineffective assistance: "Lambert's criminal conviction and death sentence are not relevant to this issue. The jury should not hear evidence of the crimes for which Lambert was convicted, unless particular facts of the case are relevant to the issue of mental retardation." Id. at 31. Petitioner summarily concludes that "[h]ad counsel objected and the letters been redacted, a reasonable probability exists the outcome of Mr. Hook's mental retardation trial would have been different and he would no longer be subject to the death penalty." (Pet. at 105.)

The facts in Lambert are distinguishable from this case. In Lambert, over objection, the state introduced evidence through several witnesses' detailed testimony of Lambert's capital crime, two unadjudicated crimes in Kansas that had previously been used in aggravation at his capital trial, and additionally presented evidence of drug abuse for which Lambert had no convictions. The OCCA held the evidence did not go to negate any claims of adaptive functioning limitations and was substantially outweighed by the danger of unfair prejudice. Lambert v. State, 126 P.3d 646, 655-56 (Okla. Crim. App. 2005). Here, letters were introduced to counter Petitioner's evidence of limitations in adaptive functioning. The letters were originally included as part of the records reviewed by the state's expert prior to her observation and assessment of Petitioner's limitations. This specific letter, unlike the very detailed witness accounts of physical violence in Lambert, generally refers to the fact that Petitioner's daughter's mother is no longer "out there". It does nothing to inform the jury of the facts of any crime other than to reference a time when Petitioner was in court and could see his daughter. The jury was obviously already aware that the letters were composed

63

while Petitioner was in prison. Petitioner has not demonstrated the determination by the OCCA was unreasonable.[22]

### 6. Ineffective Assistance of Appellate Counsel

In his next ground for relief, Petitioner asserts, "out of an abundance of caution", that his "trial/appellate counsel were ineffective for failing to investigate, develop, and present the information above during the post trial briefing process." (Pet. at 106.) As set forth earlier, the procedural posture of the state court proceeding is unusual and complex when considering certain issues raised in this proceeding. Petitioner filed in the OCCA a second application for post-conviction relief on the Atkins grounds. In the course of deciding that issue, the OCCA remanded the case to the state district court for a jury proceeding to determine whether Petitioner was mentally retarded. The same attorney represented Petitioner in the filing of the second post-conviction application as well as at the mental retardation jury trial. Subsequent to that jury trial, post-conviction/trial counsel filed a supplemental brief with the OCCA, and later filed a supplement to the supplemental brief. The OCCA's determination of the second post-conviction application was set forth in a published opinion. See Hooks v. State, 126 P.3d 636 (Okla. Crim. App. 2005).

Subsequently, based on previous decisions by the OCCA regarding the proper procedure for claims of ineffective assistance of counsel in retroactive mental retardation proceedings, Petitioner was appointed new counsel to pursue his ineffective assistance of

---

[22] Nor was it unreasonable for the OCCA to not consider the alleged juror remarks set forth in trial counsel's affidavit. See 12 O.S. 2001, § 2606(B); Fed. R. Evid. 606(b).

counsel claims in a third application for post-conviction relief. The OCCA denied relief in an unpublished opinion, Hooks v. State, PCD-2006-350, slip op.(Okla. Crim. App. Oct. 10, 2006). In that opinion, the OCCA held that while the mental retardation proceedings conducted in the second post-conviction application took place in two separate courts, they were not separate proceedings and, therefore, Petitioner was not represented in two separate proceeding by the same counsel. Relying on previous case law regarding "the peculiar and narrow circumstances raised by retrospective capital mental retardation proceedings", the court held that a subsequent post-conviction claim was the appropriate way to raise claims of ineffective assistance of counsel arising from the mental retardation proceedings. Id. at 4, 7.

Determining that the third post-conviction application was the appropriate way to raise claims of ineffective assistance of counsel during mental retardation proceedings, the OCCA rejected Petitioner's claim that post-conviction "appellate" counsel was ineffective: "Counsel was not ineffective for failing to claim Hooks had ineffective assistance in the district court mental retardation proceedings conducted as part of the second application for post-conviction relief." Id. at 7. Petitioner asserts this is correct, but claims that the OCCA failed to address his alternative ineffective assistance claim that his "appellate" counsel was ineffective for failing to present adequately his Brady/Giglio issue. (Pet. at 107-08.)

As the Court understands the issue, Petitioner claims the OCCA did not address his claim of ineffective assistance of his second post-conviction counsel for failure to adequately present the Brady/Giglio issue in her supplemental pleadings after the mental retardation

65

trial. Review of Petitioner's third application for post-conviction relief reveals that Petitioner did not raise this specific claim with the OCCA. Petitioner raised two propositions of error in his third application: (1) the prosecutor failed to turn over a potentially exculpatory witness's statement and, alternatively, former counsel was ineffective for failing to obtain and present the withheld evidence, and (2) trial and appellate counsel were ineffective for failing to adequately develop and present evidence of Petitioner's mental retardation. (Hooks v. State, PCD-2006-3350, *Third Application for Post Conviction Relief - Death Penalty*.) In his second proposition of error, Petitioner raised the following claims of ineffective assistance of counsel: (1) failure to obtain a reliable IQ score; (2) failure to investigate Petitioner's adaptive functioning; (3) failure to uncover evidence regarding state's witness Shanna Allen Dinh; (4) failure to comply with the trial court's discovery order; (5) failure to object or request portions of letters be redacted; and, (6) ineffective assistance of appellate counsel. Id.

In his claim of ineffective assistance of appellate counsel, Petitioner worded his allegation almost verbatim to the claim contained in his habeas petition: "Out of an abundance of caution, and in the alternative, Mr. Hooks also alleges his trial/appellate counsel were ineffective for failing to investigate, develop, and present *this* information during the post trial briefing process." Id. at 45 (emphasis added). He did not, however, claim ineffective assistance for failing to adequately present the Brady/Giglio issue in the supplemental pleadings. In fact, Petitioner stated in a footnote that his trial/appellate counsel, at federal habeas counsel's urging, filed a supplemental brief "containing much of the

information in this Application alleging <u>Brady</u>/<u>Giglio</u> and ineffective [assistance] of counsel issues." <u>Id.</u> n. 15.

As Petitioner failed to raise this specific claim in state court, it is unexhausted and would be procedurally barred in the OCCA. <u>Hawkins v. Mullins</u>, 291 F.3d 658, 670 (10th Cir. 2002)(citing <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 n. 1 (1991)). Petitioner failed to assert either cause and prejudice to excuse his default or that a fundamental miscarriage of justice mandates review by this Court. <u>Coleman</u>, 501 U.S. at 750.

Even were the Court to address the merits of this claim it would be denied. Assuming that ineffective assistance of appellate counsel is applicable under the unique procedural circumstances of this case in state court, the claim here would be governed by <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>See</u> <u>Jones v. Gibson</u>, 206 F.3d 946 (10th Cir. 2000). "When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue, we look to the merits of the omitted issue. If the omitted issue is without merit, counsel's failure to raise it does not constitute constitutionally ineffective assistance of counsel." <u>Id.</u> at 959 (quoting <u>Hooks v. Ward</u>, 184 F.3d 1206, 1221 (10th Cir. 1999)(quotation and citation omitted)). As discussed previously, Petitioner's <u>Brady</u>/<u>Giglio</u> claim is without merit. Accordingly, "appellate" counsel was not ineffective for failing to investigate, develop and present this claim during the post trial briefing process.

<u>Ground 3:</u>     <u>Cumulation of Errors</u>.

In his third ground for relief, Petitioner claims cumulation of errors in his mental retardation proceedings requires relief. In addition, he further claims the combined effect of

the errors raised in this Petition, together with the errors remaining on appeal regarding ineffective assistance of counsel in his original trial entitles him to habeas relief. (Pet. at 108.) Respondent responds that Petitioner failed to raise a cumulative error argument in either his second or third post-conviction applications and, therefore, his claim is unexhausted and procedurally barred. (Resp. at 40.) Petitioner concedes he did not present these arguments in state court, but asserts that it is incorrect that this Court cannot consider the issues for two reasons. First, he argues that because the alleged errors occurred in several different proceedings (original trial and mental retardation trial), he never had the opportunity to present a cumulative error claim. He surmises that once this proceeding is concluded, the Tenth Circuit will likely consolidate the appeals, making this Court the only available opportunity to raise and preserve the issue. Second, he asserts it would have been futile to raise a cumulative error argument in either post-conviction application because the OCCA did not find any errors in either of those proceedings or in the issues raised on direct appeal and his initial post-conviction application.

As stated previously, because Petitioner failed to raise this specific claim in state court, it is unexhausted and would be procedurally barred in the OCCA. Once again, however, the unusual procedural history of this case lends itself to a unique situation and piece meal review by the OCCA and by this Court of the state court determinations. This Court need not, however, wrestle through the morass of exhaustion on this claim, as it can be denied on the merits. 28 U.S.C. § 2254(b)(2). Cumulative error is present when the "cumulative effect of two or more individually harmless errors has the potential to prejudice

a defendant to the same extent as a single reversible error." <u>Duckett v. Mullin</u>, 306 F.3d 982, 992 (10th Cir.2002) (quoting <u>United States v. Rivera</u>, 900 F.2d 1462, 1469 (10th Cir.1990)). "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." <u>Id.</u> When reviewing a case for cumulative error, the Court may only consider actual errors in determining whether the Petitioner's right to a fair trial was violated. <u>Le v. Mullin</u>, 311 F.3d 1002, 1023 (10th Cir.2002).

As conceded by Petitioner (Reply at 32), the OCCA did not find any errors on direct appeal or in any of his applications for post-conviction relief.[23] Nor has this court's review of the state court proceedings disclosed any errors. Petitioner's third ground for relief, therefore, is denied.

## IV. Conclusion

After a complete review of the trial transcripts of the mental retardation trial, the mental retardation trial record, record on Petitioner's second and third applications for post-conviction relief, briefs filed by Petitioner and Respondent, and the applicable law, the Court finds Petitioner's request for relief in his *Amended Second Petition For a Writ of Habeas Corpus* (Dkt. No. 122) to be without merit. ACCORDINGLY, habeas relief on all grounds

---

[23] Although Petitioner raised a claim of cumulation of errors in his first petition for habeas relief, the Court is not convinced that it can consider that claim from a separate trial in its review of the instant claim. Evidence and testimony from the first trial was not part of the Court's consideration of the instant claims for relief. Alleged errors from the first trial, therefore, should also not be considered.

is **DENIED**.  A judgment will enter accordingly.

IT IS SO ORDERED this 26th day of February, 2010.


VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE